**WASHINGTON CENTRAL RAILROAD COMPANY, INC., Plaintiff,**

v.

**NATIONAL MEDIATION BOARD, Defendant.**

No. CY–93–3029–AAM.

United States District Court, E.D. Washington.

June 25, 1993.

Terry A. Brooks, James S. Berg, Halverson & Applegate, P.S., Yakima, WA, Ronald M. Johnson, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Washington, DC, pro hac vice, for plaintiff.

Christopher Tait, Yakima, WA, for plaintiff-intervenors.

David O. Buchholz, Dept. of Justice, Washington, DC, Robert S. Linnell, U.S. Attorney's Office, Yakima, WA, for defendant.

## ORDER RE DISPOSITIVE MOTIONS

McDONALD, District Judge.

Before the court for resolution without oral argument are the following motions: Plaintiff's Motion to Strike Portions of the Third Declaration of William J. Gill, Jr. (**Ct. Rec. 78**); Defendant's Motion to Dismiss or Alternatively for Summary Judgment (**Ct. Rec. 64**); and Plaintiff's Motion for Summary Judgment (**Ct. Rec. 58**). For the reasons discussed more fully below, the court is denying plaintiff's motion to strike; granting plaintiff's motion for summary judgment only as it relates to the participation of former employees in the representative elections; granting defendant's motion for summary judgment as to all other issues; and ordering the National Mediation Board to set aside the February, 1993 elections and resulting certifications.

## FACTS:

The following facts are gleaned from the parties' LR 56 statements of material facts as well as from other affidavits and declarations on file. Plaintiff has objected to portions of the affidavit supporting defendant's LR 56 statement. These objections are addressed below in the context of plaintiff's motion to strike. Aside from these objections, the facts presented below are uncontested except where a specific challenge is noted. Many of the facts stated by the parties as material are not summarized below as they are not necessary for resolving the issues before the court. The court therefore need not sort through the endless and acrimonious debate over these incidents.

### 1. Initial dispute

In June, 1990, a substantial number of Washington Central Railroad Company's (WCRC) employees signed authorization cards suggesting that they wanted the United Transportation Union (UTU) to represent them in negotiations with the Railroad. Ct. Rec. 61, ¶ 1. Defendant states that 22 out of 28 employees signed such cards. Plaintiff contends that it cannot agree as to the number that signed without independently verifying the signatures. Ct. Rec. 74, ¶¶ 1–2. Plaintiff does not, however, contest that many employees signed authorization cards.

Shortly thereafter the UTU filed an application with the National Mediation Board (NMB) seeking to represent the employees of Washington Central described as Train Service Representatives. The employees were not at that time represented. The Board assigned Mediator Charles Barnes to investigate whether a representation dispute existed at WCRC and, if so, in what crafts or classes.

### 2. Craft or class determination

Barnes came to Yakima on July 10, 1990 and met separately with both Nicholas Temple, President of WCRC and Andrew Sanderson, a representative of the UTU. Defendant states that during the meeting with Temple, Barnes discussed the procedures to be followed in the investigation. Barnes also discussed the craft or class issue "at length" during his meetings with Temple and Sanderson. Ct. Rec. 61, ¶¶ 9–10.

Plaintiff objects to defendant's statements about the content of discussions between Barnes and the other participants. Ct. Rec. 74, ¶¶ 8–9. Plaintiff contends that the statements are inadmissible hearsay. Defendant responds that the statements, based upon Barnes' July 10, 1990 report, are admissible under the business records or public records hearsay exceptions. F.R.Evid. 803(6), 803(8). The admissibility issue is addressed below in the context of plaintiff's motion to strike. What plaintiff does not, however, contest is that Barnes met with Temple and Sanderson on July 10, 1990.

Defendant further states that, based on these meetings, Barnes determined that there were two separate crafts or classes at WCRC, Trainmen and Engineers. In Barnes' July 10, 1990 report he states that "Both participants [Temple and Sanderson] concurred that all subject employees basically perform either historical Engineer or historical Trainmen duties and assignments." Ct. Rec. 62, Ex. 42 at 1.

On July 13th, Barnes notified the Board of his preliminary determination of crafts or classes. On July 16th, Barnes received a letter from Temple that was dated July 11, 1990. It reads in part as follows: "Pursuant to our conversation of yesterday, this letter will support the trainmen and engineer certification of five WCRC employees." Ct. Rec. 17, Ex. 2 at 1. The letter then goes on to discuss the training and job assignments of several employees. As to Russell Gohl, Temple states that Gohl "went through the WCRC trainman training program," "performed duty and was paid as a trainman on June 15, 1990," and "has been a full-time trainman since 15 June." *Id.* The letter makes similar statements as to Steve Meadows. As to John Hood, the letter states that "of any single craft Mr. Hood spent the *preponderance* of his time in train service as locomotive engineer." *Id.* (emphasis in original).

Plaintiff contests the statement that Temple concurred with Barnes' determination that there were two separate crafts. Ct. Rec. 74, ¶ 11. In support of this contention, plaintiff cites to affidavits of Temple and Burke. These affidavits, however, only speak to the merits of the dispute as to whether or not WCRC has one or two crafts. Nowhere in the affidavits is there a challenge to the fact that Barnes met with Temple and Sanderson on July 10th and discussed the appropriate craft or class designation for WCRC. Neither does plaintiff raise any objection to Temple's July 11, 1990 letter to Barnes.

Plaintiff also "disputes the claim that Mediator Barnes based his craft or class determination on any investigation of what WCRC's Train Service Representative ('TSR') employees actually do." Ct. Rec. 74, ¶ 10. In support of this challenge, WCRC cites again to Temple's affidavit and to WCRC's Objections to Mediator Andrew Stites' February, 1993 preliminary craft and eligibility determinations. Aside from making the unsupported allegation that Barnes did not investigate what WCRC employees actually do, these materials again do not contest the fact that Barnes met with Temple and Sanderson and discussed the craft designation before making his preliminary craft determination. As noted above, what the materials do present at length is WCRC's argument on the merits of the dispute as to the proper craft designation.

On July 16th Barnes provided Temple and Sanderson with the names of the employees Barnes determined were eligible to vote in the two separate crafts of Engineers and Trainmen. The letter of notification indicated that any challenges or objections had to be written, filed with the mediator, and supported by substantive evidence and argument. Ct. Rec. 17, Ex. 5. Further, the letter indicated that, in order to be considered timely, any challenges or objections had to be received by the mediator by July 25, 1990.

On July 20th, Temple sent a one page letter to Barnes, objecting for the record to Barnes' craft determination. Ct. Rec. 17, Ex. 6. Temple argued that neither the carrier, the employees, nor the union wanted the election to be divided into two crafts; that such division could create a situation where half of the employees were union while the other half were not; and that the division was an antiquated one not based on modern management systems and therefore detrimental to all involved.

On July 25th, Barnes responded that he had received and considered Temple's objections. Ct. Rec. 17, Ex. 7. Barnes rejected Temple's arguments and stood by his original craft determination. Barnes' July 25th letter further stated that the carrier could appeal the mediator's craft determination to the Board. Any such objection had to be in writing, supported by further substantive evidence or argument, "and will be denied as untimely unless received at the National Mediation Board's offices" by August 3, 1990.

*Id.* Plaintiff does not contest the fact that it never filed a timely appeal as directed by Barnes' July 25th letter.

### 3. First scheduled vote

The Board found that representation disputes existed in both crafts at WCRC. Ct. Rec. 17, Ex. 8. It decided to hold elections. Ballots were mailed on August 1, 1990 and the count was to take place on August 29th. The voter eligibility cut-off date was June 16, 1990.

On August 27, 1990, the UTU filed with the Board a request for investigation of alleged carrier interference. Ct. Rec. 17, Ex. 10. The UTU alleged several incidents of carrier interference with the conduct of the election. The following day, the UTU requested that the NMB impound the ballots until an investigation could be conducted into the allegations of interference. On August 29, 1990, the Board impounded the ballots before they were counted.

The Board states that it began its investigation into the allegations of carrier interference in September, 1990. Ct. Rec. 61, ¶ 27. Plaintiff argues that, because no discovery has been allowed in this case, they cannot confirm when the investigation began. Ct. Rec. 74, ¶ 27. The exact beginning or conduct of the investigation into allegations of carrier misconduct is not, however, critical to the resolution of the issues before this court. Suffice it to say that, between the time of the first election and February 5, 1993, first Mediator Barnes and then Mediator Stites conducted an investigation into the allegations of carrier interference in the representation disputes at WCRC.

### 4. *Todd* lawsuit

Meanwhile, on July 31, 1990, several employees and ex-employees of Washington Central filed suit in this court for, among other things, unlawful discharge, as well as for interference, intimidation, or coercion of employees in their selection of a representative, all in violation of RLA section 2, Third and Fourth. Case No. 90–CY–3066–AAM. After trial to a jury, the verdict, rendered on May 18, 1992, was that two employees, Jeffrey Todd and Gary Hages, were discharged on account of their union activity in violation of the RLA. As to those two employees, however, the jury found that WCRC had not otherwise violated the RLA by interfering with their right to organize. The discharge of a third employee, Tony Trenidad, was found not to be a violation of the RLA, and WCRC was not otherwise found to have violated the RLA as to Trenidad. As to a fourth employee, Robert Russell, WCRC's acts of coercion, threats, and harassment were found to be in violation of the RLA.

The jury awarded damages to Todd, Hages, and Russell, as well as to Daniel Hemp, on whom the jury found WCRC intentionally inflicted emotional distress. After considering additional briefing, the court, by Order of August 18, 1992, denied Todd's and Hages' requests for reinstatement as well as requests for other equitable relief from further acts in violation of the RLA. In so doing, the court stated that:

> [I]njunctive and declaratory relief are unnecessary here. While there has been a finding of RLA violations, there is not enough to warrant the expectation that such violations will occur again. The RLA violations that occurred at Washington Central Railroad were distinct incidents including the wrongful termination of two individuals, the treatment of a third employee and isolated statements by Mr. Temple in which he threatened to close the Railroad....

> It should be clear to Washington Central Railroad Company after the present litigation, that the terminations of Mr. Todd and Mr. Hages, the past treatment of Mr. Russell and Mr. Temple's threats to close the railroad down are violations of the Railway Labor Act. The court's decision to decline to grant injunctive relief should in no way indicate that the court does not view these actions as violations of federal law. It should also be clear that Washington Central Railroad Company should not repeat this conduct and if such conduct is repeated, can be redressed in this court.

*Todd, et al. v. Washington Central Railroad Co.,* Case No. 90–CY–3066–AAM, Order of August 18, 1992.

**5. February, 1993 findings and subsequent proceedings**

Between August, 1990, when the NMB impounded the ballots, and February, 1993, the NMB conducted an investigation of the alleged carrier interference with the election. As stated by the Board, the issue under investigation was:

> [W]hether Washington Central's actions in the election tainted the laboratory conditions necessary for fair elections under the Railway labor Act, i.e., whether the Carrier's actions constituted "interference, influence or coercion" for purposes of Section 2, Ninth, of the Act.

Ct. Rec. 17, Ex. 19 at 193.

On February 5, 1993, the NMB issued its Order of Findings Upon Investigation. *Id.* In that Order, the Board addressed at length the allegations of interference, influence, and coercion. The Board found that WCRC's conduct had tainted the laboratory conditions necessary for a fair election. The Board further found that "the Carrier's conduct was egregious." *Id.* at 236. Accordingly, the Board found that a re-run election was necessary.

The Board then addressed the UTU's request that the Board certify the UTU based on the authorization cards alone. Finding that the circumstances did not warrant the remedy sought by the UTU, the Board rejected the UTU's request. The Board did find, however, that because the carrier had "not only tainted the laboratory conditions but interfered with and improperly influenced employees" a *Key* ballot should be used for the re-run election.

In a *Key* ballot, failure to return a ballot is counted as a vote in favor of union representation. Further, under a *Key* ballot, unless a majority of eligible voters vote against representation, the union is certified as the employees' representative. Ct. Rec. 17, Ex. 19 at 240.

The Board also ordered that "The list of eligible voters will consist of those eligible to vote in the prior elections in accordance with Board policies and procedures." *Id.* at 238. The order did not elaborate on the policies

and procedures to which the Board was referring.

Finally, the February 5th Order denied WCRC's request that the Board find only a single craft of employees at WCRC. *Id.* at 237–38. The Board denied the request as untimely because WCRC presented no reason as to why it had not timely appealed Mediator Barnes' craft designation decision included in his July 25, 1990 letter to Temple.

On February 19, 1993, the NMB mailed out ballots to all 28 employees on the original eligibility lists. Ballots were not sent to employees hired since June 16, 1990. The vote count was scheduled for March 12, 1993.

The NMB also required WCRC to post notices of the new elections. Ct. Rec. 67, ¶ 17. The notices indicated the date on which the ballots were mailed and the date on which they were to be counted. Ct. Rec. 1, Ex. D at 1. Further, on the second page of the Notices, which were titled "Rules of Election," "eligibility" was defined as follows:

> All employees in the craft(s) or class(es) referred to in this NOTICE OF ELECTION who appear on the payroll of the carrier during the designated period and who retain an employment relationship with the carrier on the date the vote is taken are eligible to vote.

*Id.* at 2. Neither the Notices of Elections nor the Rules of Election elaborated on what the "designated period" was, what an "employment relationship" was, or what constituted the "date the vote is taken."

Of the 28 persons on the original eligibility lists, thirteen no longer worked for WCRC and were no longer on WCRC's payroll as of February, 1993. Ct. Rec. 1, ¶ 31. One had retired, five had been discharged, and seven had resigned or otherwise left WCRC. Ct. Rec. 65, Ex. D; Ct. Rec. 17, Ex. 25 at 6–11. Except for those employees involved in the *Todd* lawsuit before this court, none of the thirteen former employees filed actions for reinstatement or otherwise indicated on the record that their separations from WCRC were improperly related to their union activity.

By letter of February 19, 1993, the NMB notified Washington Central that it could

challenge or object to the eligibility of those persons to whom the NMB had sent ballots. Objections had to be supported by substantive evidence and argument. Craft or class arguments had to be supported by NMB citations. Finally, the letter indicated that: "Unsupported allegations will be insufficient to overcome presumptions of eligibility or ineligibility as reflected by the list of eligible voters." Ct. Rec. 17, Ex. 24.

Washington Central timely objected to the eligibility of the thirteen persons no longer on payroll. Ct. Rec. 17, Ex. 25. In the same filing, WCRC also objected to the craft or class division made in the original election and to the same division that was to be used in the re-run election. WCRC argued that, even if its objection to the craft designation in the original election was untimely, its objection as to the re-run election was not.

On February 25th, Mediator Stites denied WCRC's challenge to the craft designations on the same grounds as had the Board in its February 5th Order, that is, because WCRC had not timely appealed Barnes' craft designation during the course of the first election. Ct. Rec. 17, Ex. 26. Stites also denied WCRC's challenge to the eligibility of the thirteen persons no longer on payroll. Stites' stated reasons for the denial are as follows:

> In litigation referenced by the Carrier the Court found that the Carrier had subjected a number of these employees to conduct proscribed by the Act. Investigation has disclosed that others were "separated" in circumstances tainted by improper interference, influence or coercion by the Carrier. For example, a number were induced to resign for $10,000 in exchange for, among other things, waiver of "any claims of right to participate in future representation proceedings." It would be inconsistent with the Board's *Key* Order in this matter to reduce the size of the original number of eligible voters where as here the Carrier has improperly effected or contributed to such a reduction.

*Id.* at 1–2. Finally, Stites denied WCRC's request that employees hired since June 16, 1990 be allowed to vote. Again, WCRC was notified of its right to appeal Stites' decision.

Washington Central timely appealed. Ct. Rec. 17, Ex. 27. At the carrier's request, the Board sent ballots to the new-hires pending resolution of WCRC's appeal. The Board also rescheduled the vote count from March 12th to March 19th.

On March 18, 1993, the Board denied WCRC's motion for reconsideration of the NMB's February 5th Order. On March 19th, the Board denied WCRC's appeal of Stites' February 25th decision.

Accordingly, on March 19, 1993 the votes of the 28 persons on the original eligibility lists were counted. The votes of persons hired after June 16, 1990 were not counted. In the Engineer craft, seven votes were cast against the UTU out of fourteen eligible voters. In the Trainmen craft, out of fourteen eligible voters, six clearly cast votes against the union. One ballot, which was returned but not marked, was voided. The NMB certified the UTU as the representative of both crafts on May 19, 1993.

## 6. The instant action

Apparently anticipating an unfavorable resolution of its motion for reconsideration of the Board's February 5th Order and its appeal of Mediator Stites' February 25th eligibility and craft decisions, Washington Central filed the instant action on March 12, 1993. The complaint alleges that the NMB violated the terms of the Railway Labor Act and violated plaintiff's Due Process rights. The action seeks declaratory relief concerning the alleged statutory and constitutional violations. It also seeks injunctive relief prohibiting the NMB from certifying the UTU as the employees' representative, requiring the NMB to investigate appropriate crafts for future elections, and remanding the NMB's February 5, 1993 order for removal of all findings or conclusions that Washington Central interfered with the 1990 election.

The complaint's specific allegations are: that by letting non-employees vote, the NMB exceeded its authority under section 2, Ninth of the RLA; that by letting non-employees vote, the NMB violated the majority rule provisions of section 2, Fourth of the RLA; that by arbitrarily dividing the employees

into two crafts, the NMB failed to perform its statutory duty to investigate the representation dispute; that by determining that thirteen employees were separated from WCRC under conditions of improper interference, influence, or coercion, the NMB exceeded its authority by adjudicating violations of section 2, Third and Fourth of the RLA; that by deliberately fashioning orders and rulings to ensure that the UTU would win, and by conducting a secret investigation of the separation of the thirteen employees, the NMB violated its statutory duty of neutrality; and that by basing its findings on a secret investigation of the separation of those employees, the NMB violated WCRC's Due Process rights to notice and an opportunity to be heard.

On April 1, 1993, the court heard oral argument on plaintiff's motion for a preliminary injunction. Finding that plaintiff had not made a sufficient showing of probable success on the merits or of irreparable injury, the court denied plaintiff's motion. Ct. Rec. 27.

The matter is now before the court on the dispositive cross-motions of the parties. Both parties contend that there are no genuine issues of material fact and that the action can be resolved as a matter of law based on the pleadings now before the court.

**DISCUSSION:**

**1. Plaintiff's Motion to Strike Portions of the Third Declaration of William A. Gill, Jr.**

Before considering the motions to dismiss and for summary judgment, the court must consider plaintiff's motion to strike portions of the third declaration of William Gill, Jr. Gill is the Executive Director of the NMB. His third declaration is one of the supportive documents referred to by defendant in its motion for summary judgment.

Gill's third declaration states that it is true and correct and made under the penalty of perjury. Ct. Rec. 62. It further states that Gill is the Executive Director of the NMB; that, as the Executive Director, he is the official custodian of the Board's files and records; that the files and records include those pertaining to representation cases; and

that the declaration is based on Gill's review of the files and records as well as on his personal knowledge. *Id.* at ¶ 2.

Plaintiff raises several objections to portions of the Gill declaration. First, plaintiff contends that because Gill did not personally participate in activities he describes, his declaration fails to meet the personal knowledge requirement of Rule 56(e). Second, plaintiff contends that many of the statements in the declaration are inadmissible hearsay. Finally, plaintiff contends that some of the statements in the declaration are not otherwise supported by attached documents and constitute ultimate or conclusory facts or conclusions of law.

Defendant first responds that the declaration satisfies the personal knowledge requirement because Gill declares under penalty of perjury that he made the declaration on personal knowledge. Defendant further argues that personal knowledge may be established through knowledge of the contents of the file, that is, it need not be exclusively based on personal participation in the underlying events. As to the hearsay challenges, defendant argues that any arguably hearsay statements in the declaration are admissible under either the business records or public records exceptions. Finally, as to unsupported allegations, defendant argues that Gill makes such statements on his personal knowledge of this and other Board investigations.

In plaintiff's reply memo, plaintiff raises for the first time objections to the Exhibits attached to Gill's declaration. To date, both parties have submitted voluminous portions of the records and files in this case. None have been challenged until now, in the last possible pleading that can be filed before the court resolves the dispositive motions.

**A. Personal knowledge**

██ Plaintiff correctly states that an affidavit or declaration submitted in support of a motion for summary judgment must be made on personal knowledge. Fed.R.Civ.P. 56(e). Inadmissible hearsay can not substitute for personal knowledge. *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir.

1988). Neither can statements made on information and belief. *Id.*

■ Personal knowledge, however, is not strictly limited to activities in which the declarant has personally participated. As a case which plaintiff cites, clearly demonstrates, personal knowledge can come from review of the contents of files and records. *Londrigan v. Federal Bureau of Investigation,* 670 F.2d 1164, 1174–75 (D.C.Cir.1981); *see also Vote v. United States,* 753 F.Supp. 866, 868 (D.Nev.1990), *aff'd,* 930 F.2d 31 (9th Cir.1991). Based on personal knowledge of the files and records, a declarant may testify to acts that she or he did not personally observe but which are described in the record, including requests or statements by third persons made to someone other than the declarant. *Londrigan,* 670 F.2d at 1174–75 (FBI agent that reviewed file had personal knowledge sufficient to support statements about the conduct of an investigation in which he had not participated as well as about informants' requests for confidentiality).

■ Plaintiff complains that paragraphs 7–14 of Gill's third declaration, which concern Mediator Barnes' investigation, and paragraphs 15–25, which concern Mediator Stites' investigation, are not based on Gill's personal knowledge because he did not personally participate in these investigations. These objections are meritless under cases such as *Londrigan* and *Vote.* Gill has personal knowledge and that knowledge comes from his review of the records and files.

Plaintiff further objects because Gill's statement concerns the "substance of alleged conversations," the "state of mind of the participants," and "draws inferences and conclusions adverse to WCRC based on his view of these conversations." Ct. Rec. 79 at 5. Plaintiff then lists the 13 paragraphs which supposedly contain such improper statements. Plaintiff does not, however, detail what it is about each paragraph that raises these concerns.

As to the substance of conversations, the hearsay issue is discussed below. As to the state of mind objection, on close review of the declaration, the only statements that appear to go to state of mind concern whether or not Temple concurred with Barnes' initial craft determination. The statement that Temple concurred is taken directly from Barnes' report. Gill therefore has personal knowledge as to the statement in the record and, even though Temple's concurrence is irrelevant to resolution of the dispositive motions, plaintiff's objection must fail.

Finally, although there is no specific indication as to the prejudicial inferences to which WCRC objects, the court can assume that they are inferences of WCRC's non-cooperation in the investigation. While plaintiff has cited no rule against inferences in declarations, plaintiff has responded with its own affidavit. Ct. Rec. 73. The court is therefore fully apprised of the conflicting versions of the facts. As none of the facts so contested are pertinent to resolving the dispositive motions, plaintiff's objection is moot.

## B. Hearsay

■ Plaintiff further challenges Gill's declaration as containing inadmissible hearsay. Plaintiff correctly asserts that only evidence that would be admissible at trial may be considered by the court in an affidavit or declaration supporting a motion for summary judgment. Fed.R.Civ.P. 56(e); *see also* 10A Wright, Miller & Kane, *Federal Practice and Procedure,* § 2738 at 470–74 (1983).

■ Defendant argues that all of the arguably hearsay statements in Gill's declaration are admissible either under the business records exception or the public records exception. *See* F.R.Evid. 803(6) & 803(9). The reports and records upon which Gill's statements are based appear on their face to have been made by persons with knowledge of the events; to have been made at or near the time events were recorded; and to have been made and kept in the ordinary course of the NMB's business. They therefore appear on their face to satisfy the business records exception's foundational requirements for admissibility. F.R.Evid. 803(6).

■ Under Rule 803(6), however, the proponent bears the burden of establishing these foundational requirements through the testimony of the custodian. *Tongil Co. v.*

*The Vessel "Hyundai Innovator"*, 968 F.2d 999 (9th Cir.1992). Gill, the custodian of the records and files, does not establish these foundational requirements. Specifically, Gill's declaration fails to establish who made the records, when they were made, or that they were made and kept in the ordinary course of business. While none of these issues appears to be seriously challenged, the court cannot ignore the explicit language of Rule 803(6) and must therefore conclude that the business records exception does not apply to the exhibits attached to Gill's declaration. The court must therefore grant plaintiff's motion to strike hearsay statements unless any other hearsay exceptions apply.

■ Defendant next argues that the public records exception covers the reports of mediators and the Board and therefore Gill's statements based on review of those reports. That exception applies to "Records, reports, statements, or data compilations in any form, of public offices or agencies, setting forth ... factual findings resulting from investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." Fed.R.Evid. 803(8).

■ Plaintiff argues, without citation to any authority, that the business records exception and the public records exception have identical foundation requirements. By their plain terms, however, the two exceptions have quite different foundation requirements. *Compare* Fed.R.Evid. 803(6) *with* Fed. R.Evid. 803(8). Whereas the business records foundation includes the testimony of the custodian as to when the record was made, the personal knowledge of the maker, and the course of business as to making and keeping records, the public records exception only requires that the records be those of a government agency that include factual findings resulting from investigations made pursuant to lawful authority.

There is no dispute that the NMB is a government agency. Nor is there dispute that Mediator Barnes, Mediator Stites, and the Board were all conducting investigations authorized by law. Accordingly, the records are presumed admissible unless the opposing party can make a showing that they are untrustworthy. This last point is demonstrated by a recent Ninth Circuit case much like the one at bar. *Johnson v. Pleasanton,* 982 F.2d 350 (9th Cir.1992).

In *Johnson,* the disputed evidence was a sworn declaration by an agency director supported by staff reports, all of which was submitted in support of a motion for summary judgment. The District Court excluded the evidence on the grounds that it was hearsay and opinion. Because the mere fact that documents contain opinions does not make them inadmissible under Rule 803(8)(C), and because the party opposing introduction of the documents offered no evidence to show that the records were untrustworthy, the Ninth Circuit reversed. In so doing, the court made the following comments:

> The Johnsons did not challenge the Planning Department's staff report and Swift's declaration as untrustworthy; rather they contend that the City bears the burden of overcoming the hearsay rule before it can offer the documents. On summary judgment, however, this shifting of the burden would stand the public records exception on its head.
>
> The trial court is entitled to presume that the tendered public records are trustworthy. If the Johnsons seriously think the documents are untrustworthy, they can challenge them on that ground. When public records are presumed authentic and trustworthy, the burden of establishing a basis for exclusion falls on the opponent of the evidence. A party opposing the introduction of a public record bears the burden of coming forward with enough negative factors to persuade a court that a report should not be admitted.

*Id.* at 352 (citations omitted).

In the case at bar, Exhibits 42 and 47 (Barnes' and Stites' reports), which plaintiff challenges in its reply memorandum, meet all of the admissibility criteria for public records. Because plaintiff has made no allegations that these reports are untrustworthy, the court finds that they are admissible and therefore properly before the court. Further, because several paragraphs of Gill's

third declaration are based on his personal knowledge of the contents of those reports (¶¶ 9, 11, 17–20), plaintiff's motion to strike those paragraphs must be denied.

For the above reasons, Exhibit 19 to Ct. Rec. 17 (NMB February 5, 1993 Findings Upon Investigation) is also admissible under the public record exception. Therefore, plaintiff's objection to paragraph 14 of Gill's third declaration must fail as well.

■ Finally, although it is not clear whether plaintiff is challenging the admissibility of Exhibits attached to other declarations before the court, one of them provides the support for paragraph 13 of Gill's declaration, which plaintiff is challenging, and the court must therefore consider the admissibility of the Exhibit. Paragraph 13 refers to Temple's letter to Barnes dated July 11, 1990 in which Temple provided information on "the trainmen and engineer certification of five WCRC employees." Ct. Rec. 17, Ex. 2. The court finds that the letter is an admission by a party opponent and is therefore not hearsay. Fed.R.Evid. 801(d)(2). Accordingly, plaintiff's objection to paragraph 13 of Gill's third declaration is without merit.

Based on the above, nine of the twelve paragraphs to which plaintiff raised hearsay objections are admissible under recognized exceptions. The remaining three paragraphs (¶¶ 12, 21, 23) do not contain facts necessary or even pertinent to resolution of the dispositive motions. Accordingly, the court is denying the motion to strike those three paragraphs as moot. However, should the facts discussed therein become significant during later proceedings, the court does note for the record that plaintiff has raised objection to the statements.

## C. Other objections

■ Plaintiff raises two other objections to Gill's third declaration. First, plaintiff argues that four of the statements are not supported by documentary evidence.[1] Plaintiff, however, cites no authority for the proposition that every statement in a declaration that is made on personal knowledge must be supported by attached documentation. Gill's affidavit states that the WCRC record contains thousands of pages of exhibits, statements, and documents. Ct. Rec. 62, ¶ 3. Among those materials is Stites' Mediator's Report to the Board which included over 600 pages of evidentiary materials. Ct. Rec. 62, ¶ 25.

Although Gill does not attach all of these materials, he does state that his declaration is based on a review of the files and records. Given that there is no requirement that all statements made on personal knowledge be supported by independent documentation, and given that Gill states, under penalty of perjury, that his declaration is based on personal knowledge of the contents of the file, plaintiff's objection to these paragraphs of Gill's declaration is without merit.

■ Plaintiff's original memorandum objects to the same four paragraphs because they state ultimate or conclusory facts or conclusions of law. Plaintiff is correct that Rule 56(e) "limits the matter to be properly included in an affidavit to facts, and the facts alleged must be made on personal knowledge." 10A Wright, Miller & Kane, *Federal Practice and Procedure*, § 2738 at 486 (1983). Therefore "ultimate or conclusory facts and conclusions of law ... cannot be utilized on a summary judgment motion. Similarly, the mere reargument of a party's case or the denial of an opponent's allegations will be disregarded." *Id.* at 486–95.

The four paragraphs plaintiff challenges concern the submission of Authorization cards by employees; Stites' interviews with Temple in May, June, and July of 1991; and Stites' interviews with employees in July, 1991. As is apparent from the discussion below, none of these events has any bearing whatsoever on the dispositive motions. It is therefore impossible for them to be "ultimate or conclusory" or "conclusions of law."

Because Gill's third declaration is based on personal knowledge, does not contain inadmissible hearsay, and is not otherwise objectionable, the court is denying plaintiff's motion to strike. As to the three paragraphs

---

1. In its reply memo, plaintiff expands the list of objectionable paragraphs from four to nine. Inexplicably, only two of the original four paragraphs are on plaintiff's new list.

that arguably contain inadmissible hearsay, the court is denying the motion to strike as moot, rather than on the merits.

## 2. Defendant's Motion to Dismiss or for Summary Judgment and Plaintiff's Motion for Summary Judgment

Defendant moves the court to dismiss the entire action with prejudice pursuant to Rule 12(b)(1), that is, for lack of subject matter jurisdiction. Alternatively, pursuant to Rule 56(b), defendant moves the court to grant summary judgment of dismissal on the grounds that the NMB has not committed any gross violations of the RLA or violated plaintiff's constitutional rights. Plaintiff cross-moves for summary judgment on the grounds that the NMB has committed several gross violations of the RLA and violated plaintiff's Due Process rights. Because the factual and legal issues underlying the cross-motions are essentially identical, the motions are considered simultaneously.

## A. Motion to dismiss for lack of subject matter jurisdiction

Rule 12(b)(1) motions are generally considered motions in abatement that do not go to the merits of the case. 5A Wright & Miller, *Federal Practice and Procedure*, § 1350 (1990). When resolution of a jurisdictional issue is separable from resolution of factual disputes on the merits of the case, the court may consider evidence presented on the jurisdictional issue, and, if necessary, resolve disputes as to jurisdictional facts. *Thornhill Publishing Co. v. General Tel. & Elec. Corp.*, 594 F.2d 730, 733 (9th Cir.1979). However, when resolution of the jurisdictional issue requires an inquiry into the merits of the case, the court should not treat the matter as one in abatement, and should instead "await a determination of the merits either by the court on a summary judgment motion or by the fact finder at trial." 5A Wright & Miller, *supra*, at p. 235; *see also, Trentacosta v. Frontier Pac. Aircraft Indus.*, 813 F.2d 1553, 1558–59 (9th Cir.1987); *ITSI T.V. Prod., Inc. v. California Auth. of Racing Fairs*, 785 F.Supp. 854, 858 (E.D.Cal.1992).

As is discussed more fully below, subject matter jurisdiction in RLA section 2,

Ninth representation cases only exists where the NMB has grossly violated the RLA or has committed a constitutional violation. *See, e.g., Virgin Atl. Airways, Ltd. v. National Mediation Bd.*, 956 F.2d 1245, 1249–50 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 67, 121 L.Ed.2d 34 (1992). Determination of whether the court has jurisdiction therefore turns on the inquiry into the merits of WCRC's claims that the NMB grossly violated the RLA and WCRC's constitutional rights. Accordingly, the court is resolving the issue of jurisdiction through the cross-motions for summary judgment rather than through the Rule 12(b)(1) motion.

## B. Cross–motions for summary judgment

### i. Summary judgment standard

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir.), *cert. denied,* 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975). Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Semegen v. Weidner,* 780 F.2d 727 (9th Cir.1985).

The moving party has the initial burden to prove that no genuine issue of material fact exists. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* The party opposing summary judgment must go beyond the pleadings to designate specific facts establishing a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). In ruling on a motion

for summary judgment, all inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmovant. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356.

■ At the summary judgment stage, the court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11. In resolving these issues, "the court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 631 (9th Cir.1987); *see also Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

In the case at bar, both parties are moving for summary judgment and arguing that there are no disputes as to the facts they find to be material. Where the parties differ is in their discussion of which facts are material and what legal conclusions the court must draw from those facts. Given that virtually all of the legal arguments in this case relate to the dispute concerning the court's jurisdiction, a general discussion of subject matter jurisdiction in RLA section 2, Ninth representation cases follows.

### ii. Jurisdiction generally

■ All of the NMB's conduct that plaintiff challenges in this action occurred during the course of the NMB's "investigation"[2] of the representation dispute at WCRC. Under section 2, Ninth of the RLA, the NMB has the duty to investigate certain representation disputes. 45 U.S.C. § 152, Ninth. The text of the statute is as follows:

**Ninth. Disputes as to identity of representatives; designation by Mediation Board; secret elections**

If any dispute shall arise among a carrier's employees as to who are the representatives of such employees designated and authorized in accordance with the requirements of this chapter, it shall be the duty of the Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify to both parties in writing, within thirty days after the receipt of the invocation of its services, the name or names of the individuals or organizations that have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier. Upon receipt of such certification the carrier shall treat with the representative so certified as the representative of the craft or class for the purposes of this chapter. In such an investigation, the Mediation Board shall be authorized to take a secret ballot of the employees involved, or to utilize any other appropriate method of ascertaining the names of their duly designated and authorized representatives in such a manner as shall insure the choice of representatives by the employees without interference, influence, or coercion exercised by the carrier. In the conduct of any election for the purposes herein indicated the Board shall designate who may participate in the election and establish the rules to govern the election....

The parties to this action do not contest that the NMB's section 2, Ninth duty to investigate was properly invoked. Accordingly, any consideration of the court's jurisdiction to hear all or part of this action must pay particular attention to section 2, Ninth cases.

Federal subject matter jurisdiction to review issues raised under the RLA is not monolithic. As the Supreme Court has pointed out, Congress created different standards of judicial review in different sections of the RLA. *Switchmen's Union of North America v. National Mediation Bd.,* 320

**2.** "Investigation" in the context of the Railway Labor Act is a term of art. It encompasses all of the means by which the NMB seeks to determine whether employees wish to be represented in collective bargaining and by whom they wish to be represented. Investigation includes traditional means like site visits and interviews. It also includes the conduct of elections like those at issue in the case at bar. Incident to the power to conduct elections, the NMB has the power to determine who is eligible to participate in those elections and how the elections should be conducted.

U.S. 297, 305–06, 64 S.Ct. 95, 99–100, 88 L.Ed. 61 (1943). As between section 2, Ninth and other sections of the Act, the Court found that Congress "drew a plain line of distinction.... Congress gave administrative action under § 2, Ninth a finality which it denied administrative action under other sections of the Act." *Id.* at 306, 64 S.Ct. at 99.

■ In general, the conduct of RLA section 2, Ninth investigations is considered to be within the NMB's discretion and therefore immune from judicial interference. *See, e.g., Switchmen's Union,* 320 U.S. at 305, 64 S.Ct. at 99; *Brotherhood of Ry. & S.S. Clerks v. Association for Benefit of Non–Contract Employees,* 380 U.S. 650, 85 S.Ct. 1192, 14 L.Ed.2d 133 (1964) (hereinafter *Railway Clerks* ). Judicial review of NMB representation investigations has been variously called "one of the narrowest known to the law," *International Ass'n of Machinists & Aerospace Workers v. Trans World Airlines, Inc.,* 839 F.2d 809, 811 (D.C.Cir.), *cert. denied,* 488 U.S. 820, 109 S.Ct. 62, 102 L.Ed.2d 40 (1988), and "extraordinarily limited," *Professional Cabin Crew Ass'n v. National Mediation Bd.,* 872 F.2d 456, 59 (D.C.Cir.), *cert. denied,* 493 U.S. 974, 110 S.Ct. 497, 107 L.Ed.2d 500 (1989).

Within section 2, Ninth cases, some courts perceive differences in the availability of judicial review depending on the precise issue involved. One formulation of this division considers whether the issue involves the NMB's invocation or refusal to invoke its own jurisdiction to investigate. *International Longshoremen's Ass'n v. National Mediation Bd.,* 785 F.2d 1098 (D.C.Cir.1986). This formulation holds that NMB jurisdictional orders are reviewable by the courts whereas NMB certification orders following investigation are not. *Id.* at 1100–01 (NMB order refusing to investigate because port authority was not a "carrier" was judicially reviewable); *see also Railway Labor Executives Ass'n v. National Mediation Bd.,* 988 F.2d 133 (D.C.Cir.1993) (NMB policy allowing sua sponte or carrier invoked investigation was judicially reviewable).

In the case at bar, no party has challenged the NMB's invocation of its authority to investigate. Further, the disputes over eligibility and the adequacy of investigation do not concern the NMB's jurisdiction in this investigation. Accordingly, this case does not fit into the judicially reviewable class of cases concerning NMB jurisdictional orders.

■ Another formulation of the division in section 2, Ninth cases considers whether the case is a "run of the road" case concerning the NMB's "resolution of a particular dispute among a carrier's employees concerning their representation" or an "exceptional case" where the "Board has arrogated authority Congress did not give it to revise Section 2, Ninth." *Railway Labor Executives' Ass'n,* 988 F.2d at 136–38. Run of the road cases are not reviewable by the courts, exceptional cases are. Put somewhat differently,

> [S]o long as the Board is acting with the purpose of "find[ing] the fact" as to who is the employees' representative, the courts are deprived of jurisdiction to review Board decisions.
>
> On the other hand, when the Board acts in excess of its statutory authority, judicial review may be available.

*America West Airlines, Inc. v. National Mediation Bd.,* 986 F.2d 1252, 1256–57 (9th Cir.1993).

■ This case precisely poses the question of whether none, some, or all of the NMB's actions that WCRC challenges are run of the road fact finding or whether they are exceptional arrogations of authority not provided by Section 2, Ninth. A standard formulation of the conditions under which a court may review NMB investigation and certification actions restricts such review to "gross violations" of the RLA and violations of the carrier's constitutional rights. *Railway Labor Executives' Ass'n,* 988 F.2d at 136 (citing *International Ass'n of Machinists,* 839 F.2d at 811–12).

In order to determine whether such violations have occurred, the court may take a "peek at the merits." *Professional Cabin Crew Ass'n,* 872 F.2d at 459. If the peek reveals egregious violations, the court may proceed. Accordingly, the following sections

constitute that peek at the merits necessary to determine the court's jurisdiction.

### iii. Gross violations of the RLA and constitutional claims

Plaintiff's motion for summary judgment contends that the NMB committed egregious violations of the RLA in four specific ways. First, WCRC contends that allowing thirteen persons with no continuing employment relationship to vote in the re-run elections and then certifying the UTU based on those elections violates the RLA's command that it is only employees who are to choose representation. Second, WCRC contends that certifying the UTU as the employees' representative in the Engineers' craft based on a tie vote violates the RLA's command that selection of a representative must be made by a majority of the employees. Third, WCRC contends that the NMB improperly adjudicated unfair labor practice allegations in its decision to allow thirteen former employees to vote. Fourth, WCRC contends that the NMB violated its express duty to investigate the proper craft or class for the election. Finally, WCRC argues that the NMB violated the carrier's Due Process rights because of the manner in which the NMB conducted the alleged unlawful adjudication. The court will address these allegations in order with the exception of voter eligibility, which it will address last.

#### a. Majority vote

■ The February, 1993 re-run elections were held according to a procedure known as a *Key* ballot. *Key* balloting is used by the Board for re-run elections where the Board concludes there has been carrier interference in the original election. Under the *Key* ballot rules stated by the Board for the conduct of the elections, "The organization [UTU] will be certified as the collective bargaining representative unless a majority of the eligible employees vote against representation." Ct. Rec. 17, Ex. 19 at 238.

In the craft of Engineers, the vote was a tie, seven votes were cast against union representation and seven in favor. Accordingly, under the rules established for the election, because a majority of eligible voters had not voted against representation, the Board certified the UTU as the representative of the Engineers. Ct. Rec. 62, Ex. 50.

Plaintiff[3] argues that certifying the UTU, when a majority of eligible employees had not voted in favor of representation, violates section 2, Fourth's majority rule provision, which plaintiff argues binds the NMB in the conduct of section 2, Ninth investigations. The Board responds that section 2, Ninth does not require the Board to conduct elections, and that even where the Board does conduct elections, it has substantial discretion to do so by whatever means it deems appropriate for determining the will of a majority of a craft or class.

The court notes that, despite the rule in *Key* ballot elections that the union is certified unless a majority votes against representation, the parties have cited no cases in which the Board has been confronted with a tie vote. Accordingly, the Board's authority to certify a union when there simply is no majority has not been tested.

■ Given that the court is finding that the NMB's eligibility decision was a gross violation of the RLA (see infra section iii.e), and given that the court is setting aside the certifications, the court could consider the issue of the Board's authority in the case of a tie to be moot. However, because of the strong presumption that the Board has the discretion to reasonably construe the meaning of terms in the RLA, the court finds that certifying the union on the basis of a tie was not a gross violation of the RLA.

Section 2, Ninth gives the Board the authority to "establish the rules to govern the election." 45 U.S.C. § 152, Ninth. The Supreme Court has noted that the Act instructs "the Board alone to establish the rules governing elections. Thus it is clear that its decision on the matter [the form of the ballot to be used] is not subject to judicial review where there is no showing that it has acted in

---

**3.** The court notes that the Intervenors in this action filed a memorandum in opposition to defendant's motion for summary judgment. Although extremely terse, it supports plaintiff's argument that certifying the UTU in the Engineers' election when it received less than a majority vote was a violation of the Act.

excess of its statutory authority." *Brotherhood of Ry. & S.S. Clerks v. Association for Benefit of Non–Contract Employees*, 380 U.S. 650, 669, 85 S.Ct. 1192, 1202, 14 L.Ed.2d 133 (1964). More recently, courts have held that the Board's authority includes the authority to reasonably construe the meaning of the term "majority" as it is used in the Act. *See Zantop Int'l Airlines, Inc. v. National Mediation Bd.*, 732 F.2d 517, 520 (6th Cir.1984) (citing and affirming District Court holding).

Practically speaking, it is reasonable to establish a rule concerning who is to be declared the winner in the case of a tie. In this case, based on the finding of carrier interference in the original election, and the subsequent choice of a *Key* ballot, the rules were clear before the votes were cast, a tie would go to the union. Section 2, Fourth says that a majority of employees shall have the right to determine who shall represent them. It does not address a tie. Nor does it state that a majority must favor representation before the Board can issue a certification.

The court therefore finds that nothing in the RLA explicitly or implicitly dictates how the Board must handle tie votes. The court further finds that the Board's *Key* rule is a reasonable one for dealing with a tie in a re-run election where there has been carrier interference. Accordingly, following *Railway Clerks* and *Zantop*, the Board's decision in the case at bar was within its unreviewable discretion. Therefore, on the issue of majority votes, the court finds no violation of the RLA. Accordingly, it is granting summary judgment on the issue to the Board, and denying summary judgment to plaintiff.

### b. "Adjudication" of separations

Plaintiff next alleges that the NMB exceeded its jurisdiction by adjudicating the issue of whether or not the 13 former employees deemed eligible in the re-run election were dismissed in violation of the RLA. The NMB does not have the authority to adjudicate and enforce claims that a carrier violated section 2, Third and Fourth of the RLA. *See America West Airlines, Inc. v. National Mediation Bd.*, 986 F.2d 1252 (9th Cir.1993). Accordingly, plaintiff argues, defendant's finding that former employees were " 'separated' in circumstances tainted by improper interference, influence or coercion," and that they were therefore presumptively eligible to vote, was an unauthorized adjudication of unfair labor practices.

This claim is intricately related to plaintiff's claim that the NMB violated the RLA by allowing the former employees to vote. Therefore, given that the court is finding that the eligibility decision was a gross violation of the RLA (see infra section iii.e), and given that the court is setting aside the votes and certifications, that portion of plaintiff's adjudication claim that is based on the resulting eligibility determination is moot. Accordingly, the court is denying plaintiff's allegation of unauthorized adjudication to the extent that it is based on the eligibility issue. However, because part of the adjudication claim is based on the Board's finding of interference itself, the court must make a finding on that part of the issue.

Plaintiff's adjudication claim is based in substantial part on *America West*. Plaintiff's significant misstatement of that case is therefore troublesome. Plaintiff states that in *America West* "the NMB did not assess fines or order reinstatement, yet the Courts still found the NMB had adjudicated unfair labor practices." Ct. Rec. 83 at 11; *see also* Ct. Rec. 75 at 18. The facts and holding in *America West* were exactly the opposite. The court found that the Board had *not* adjudicated unfair labor practices, and that *because it had not conducted an adjudication,* a proposed Notice to Employees that *implied* that it had done so was improper.

There was no challenge in *America West* to the Board's findings that the carrier had improperly interfered with, influenced, and coerced its employees. In fact, the carrier and the court appear to agree that such findings are a necessary incident to the Board's duty to investigate the dispute in such manner as "shall insure the choice of representative by the employees without interference, influence, or coercion exercised by the carrier." *See America West*, 986 F.2d at 1258 n. 6 ("the Carrier does not dispute that the Board may make a 'finding' of illegal influence, for example, for purposes of deter-

mining the next step in its *investigation* of a representation dispute") (emphasis in original); *see also* 45 U.S.C. § 152, Ninth.

In the case at bar, the Board conducted a continuous investigation into the labor dispute at WCRC. That investigation included investigation into the allegations of carrier interference with the conduct of elections. Section 2, Ninth places an affirmative duty on the Board to conduct its investigations "in such manner as shall insure the choice of representatives" without carrier interference, influence, or coercion. 45 U.S.C. § 152, Ninth. Accordingly, any Board findings as to allegations of interference, influence, and coercion are not only authorized but in fact compelled by the Act. Therefore, on the issue of adjudication, the court finds no violation of the RLA. Accordingly, it is granting summary judgment on the issue to defendant, and denying summary judgment to plaintiff.

### c. Investigation and designation of crafts

Plaintiff further alleges that the NMB grossly violated the RLA by failing to fulfil its statutory duty to investigate the proper craft designations for Washington Central's employees. Plaintiff claims Mediator Barnes failed to investigate the craft issue for the original election. Plaintiff also claims that neither Mediator Stites nor the Board investigated the craft issue for the re-run election.

Section 2, Ninth imposes a statutory duty on the NMB to investigate representation disputes. That duty was properly triggered in this case. The nature of the duty is to "make such investigation as the nature of the case requires." *Brotherhood of Railway & Steamship Clerks v. Association for Benefit of Non–Contract Employees*, 380 U.S. 650, 662, 85 S.Ct. 1192, 1198, 14 L.Ed.2d 133 (1965). Further, "an investigation is 'essentially informal, not adversary'; it is 'not required to take any particular form.'" *Id.* (quoting *Inland Empire District Council v. Millis*, 325 U.S. 697, 706, 65 S.Ct. 1316, 1321, 89 L.Ed. 1877 (1945).

A necessary incident to the NMB's power to investigate representation disputes is the power "to determine what is the appropriate craft or class in which the election should be held." *Switchmen's Union of North America v. National Mediation Bd.*, 320 U.S. 297, 301, 64 S.Ct. 95, 97, 88 L.Ed. 61 (1943). The authority of the NMB to interpret and apply the term "craft" in the course of a representation dispute is essential to the performance of its duty. *Id.* at 305, 64 S.Ct. at 99. Accordingly, the Supreme Court stated fifty years ago that a dispute over the Board's fact finding on the craft issue "was to reach its last terminal point when the administrative finding was made. There was to be no dragging out of the controversy into other tribunals of law." *Id.* As the Tenth Circuit has succinctly stated it: "The power to resolve disputes concerning class or craft designations for a representation election belongs to the NMB ... and not to the federal courts." *Kiamichi R.R. Co. v. National Mediation Bd.*, 986 F.2d 1341, 1343 (10th Cir. 1993).

Some twenty years after *Switchmen's Union*, the Supreme Court addressed whether the Board's process for determining appropriate crafts could be judicially reviewed. *Railway Clerks*, 380 U.S. at 660–68, 85 S.Ct. at 1197–1202. Again, the Court resoundingly rejected judicial review. The Court found that Congress left to the Board the task of "selecting the methods and procedures which it should employ in each case." *Id.* at 662, 85 S.Ct. at 1199. Further, the Act does not require that the carrier be made a party to the craft determination process. *Id.* at 666, 85 S.Ct. at 1200–01. In fact, "[w]hether and to what extent carriers will be permitted to present their views on craft or class questions is a matter that the Act leaves solely in the discretion of the Board." *Id.* at 666–67, 85 S.Ct. at 1201. Finally, referring to another aspect of representation investigations committed to the Board's discretion, the Court stated that such matters "are not subject to judicial review, for it was to avoid the haggling and delays of litigation that such questions were left to the Board." *Id.* at 671, 85 S.Ct. at 1203.

The one recognized exception to this bar on judicial review arises when the NMB refuses or fails completely to investigate. *Russell v. National Mediation Bd.*, 714 F.2d

1332 (5th Cir.1983), *cert. denied,* 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984); *International In–Flight Catering Co. v. National Mediation Bd.,* 555 F.2d 712 (9th Cir. 1977). As the Ninth Circuit put it:

> [R]eviewing a certification after an investigation by the NMB and reviewing whether the NMB made its statutory investigation at all are two completely different matters. While we cannot, and do not, review the former, we can and do review the latter.

*International In–Flight Catering,* 555 F.2d at 717.

■ Plaintiff argues that its claims fall within this narrow exception. That is, plaintiff claims that Mediator Barnes failed to investigate crafts or classes at WCRC. Because the NMB claims that he did, plaintiff argues there is a genuine issue of material fact that necessitates denying defendant's motion for summary judgment. As noted above, however, the NMB's statement of material facts and supporting materials establish that Barnes met with Temple and Sanderson before making his preliminary craft determination. Ct. Rec. 61, ¶ 9; Ct. Rec. 62, Ex. 42. The materials further establish that Barnes discussed "at length" the matter of appropriate crafts or classes at WCRC with both Temple and Sanderson. Ct. Rec. 62, Ex. 42 at 1. Finally, the uncontested facts before the court establish that Temple wrote to Barnes the next day "pursuant to our conversation of yesterday" to provide Barnes with information on whether certain employees were properly designated Trainmen or Engineers. Ct. Rec. 17, Ex. 2 at 1.

Given that it is the NMB and not the court that is to determine the proper craft, and given that the NMB has unreviewable discretion to determine the methods and procedures for investigating disputes, including proper craft designations, these facts alone, if uncontested, establish that the NMB met its statutory duty to investigate, therefore entitling the Board to judgment as a matter of law. The facts establish that Barnes engaged in investigation comparable to that deemed sufficient both in *Railway Clerks* and, more recently, in *Kiamichi Railroad.*

Plaintiff challenges whether the supportive materials are admissible, but plaintiff does not challenge the fact that the meetings took place and that craft issue was discussed. As is addressed more fully above, in the context of plaintiff's motion to strike, plaintiff's challenge to admissibility fails and the fact of the meetings and the subject of discussion are therefore properly before the court. Because plaintiff has provided no specific facts beyond the bare allegation that Barnes failed to investigate, plaintiff has failed to meet its reciprocal burden on a motion for summary judgment. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986).

■ While the above demonstrates that defendant is entitled to summary judgment as to its investigation of craft or class in the original election, it does not necessarily resolve the issue as to the re-run election. Plaintiff argues that the Board was under an independent duty to reinvestigate the dispute after cancellation of the first election and before commencement of the re-run. From the pleadings on file, it appears that the Board never did consider the merits of plaintiff's craft arguments after July, 1990. Defendant's repeated response to plaintiff's assorted motions and appeals was that the issue was resolved in July, 1990 by Mediator Barnes, that WCRC was notified of its right to appeal that decision, that WCRC failed to timely do so, and that the Board was therefore under no duty to revisit the issue. *See* Ct. Rec. 17, Ex. 19 at 237–38; Ex. 26; Ex. 37 at 292–93; Ex. 38 at 297.

While plaintiff's claim that the Board did not conduct a new investigation of appropriate crafts appears to be supported by the record, plaintiff has provided the court with no authority to support the proposition that abandonment of the original election because of interference somehow vitiates the previously conducted investigation or triggers a new duty to investigate. As noted above, it is within the Board's discretion to investigate as the nature of the case demands, to establish methods and procedures for that investigation, and to establish rules for the conduct of elections and re-run elections. The Board's determination that the re-run election in this matter was part of the ongoing

investigation and should therefore proceed according to the initial craft designations is squarely within its unreviewable discretion.

Accordingly, even if the court thought that, given the two and a half year delay in the elections, it would have been reasonable for the NMB to address plaintiff's craft arguments on the merits, such judgment is for the Board, not for the court. Therefore, lest the "haggling and delays of litigation" continue any longer, the court finds no violation of the RLA as to the issue of craft designation. Accordingly, it is granting summary judgment on the issue to defendant, and denying summary judgment to plaintiff.

#### d. Washington Central's Due Process claim

Plaintiff argues that the NMB violated plaintiff's Due Process rights by adjudicating the unlawful separation of the former employees without providing notice of the allegations or an opportunity to be heard; by adopting new and extraordinary election procedures without notice or explanation; and by adopting an irrebuttable presumption of eligibility as to the former employees.

Having found that the NMB did not engage in adjudication, plaintiff's claim that the conduct of that adjudication violated plaintiff's Due Process rights must also fail. Plaintiff notes that its Due Process rights as to the NMB's findings only arise if the NMB was in fact adjudicating. Ct. Rec. 65 at 18 n. 11. Accordingly, the court finds that there was no violation of plaintiff's Due Process rights based on improper adjudication.

Further, like plaintiff's adjudication claim, its Due Process claim turns in part on the Board's decision to allow the thirteen former employees to vote in the re-run elections. Plaintiff's allegation that the NMB violated plaintiff's Due Process rights by adopting new and extraordinary election procedures seems to refer to the eligibility decision. Therefore, given the court's finding that the eligibility decision was a gross violation of the RLA (see infra section iii.e), and given that the court is setting aside the certifications, that portion of plaintiff's Due Process claim that concerns application of new and extraordinary election procedures is moot. Accordingly, to the extent that plaintiff's Due Process claim is based on the eligibility decision, the court finds no constitutional violation.

Finally, plaintiff argues that, as to the thirteen former employees, the Board adopted what was, in reality, an irrebuttable presumption of eligibility for the February elections. Again, given the court's finding that the eligibility decision was a gross violation of the act, the court need not reach the Due Process claim. For the above reasons, the court finds no violation of WCRC's constitutional rights. Accordingly, it is granting summary judgment to the Board, and denying summary judgment to plaintiff.

#### e. Voter eligibility

In the court's opinion, plaintiff's most troubling allegation concerns the NMB's decision to allow former employees to vote in the re-run elections. Defendant has never contested the fact that, as of the February, 1993 vote, none of the thirteen persons at issue were working for the carrier. Likewise, none of them had pending actions for reinstatement. The purely legal question then is whether, in a re-run election, the NMB can include as eligible voters persons who were eligible to vote in the original election but who are no longer employees of the carrier.

Plaintiff's argument is essentially that section 2, Ninth investigations are limited to the class of persons who are employees. Plaintiff also points to the definition of the term employee as "every person in the service of a carrier (subject to its continuing authority to supervise and direct the manner and rendition of his service)." 45 U.S.C. § 151, Fifth. Finally, plaintiff cites several cases which suggest that the NMB has no authority to alter the definition of the term employee set by the statute, and that the term includes only current employees.

The NMB's argument is essentially twofold. First, it argues that section 2, Ninth gives it broad discretion to determine who is eligible to vote in an election ("the Board shall designate who may participate in the election"). Second, it relies on its authority under section 2, Ninth to use elections or "any other appropriate method of ascertain-

ing" the employees' choice of representative. The Board also points out that, in section 2, Ninth cases, courts have never strictly limited the class of eligible voters to only those covered by section 1, Fifth's technical definition of employees. That is, courts have upheld NMB decisions that furloughed workers, discharged workers seeking reinstatement, and striking workers subject to preferential rehire were eligible voters.

The specific issue before this court is one of first impression. The issue is whether former employees, with no pending claims for reinstatement who are not otherwise subject to re-hire, can be eligible to participate in re-run elections. Resolution of the issue requires the court to interpret the RLA and the relatively few cases that have considered analogous questions.

It is undeniable that Section 2, Ninth repeatedly refers to employees and to determining who it is that employees want as their representative. 45 U.S.C. § 152, Ninth. The section is principally concerned with how it is the NMB is to discern the representation wishes of employees. It is also undeniable that section 1, Fifth of the RLA defines employees as persons who are in the service of a carrier, subject to the carrier's continuing authority, and performing work for the carrier. 45 U.S.C. § 151, Fifth. Neither party seriously contests these interpretations. What they do contest is how the two sections interrelate, who it is the NMB may consider an employee for the purposes of eligibility, and the significance of the fact that this is a re-run election.

Several courts have considered the interrelations of section 1, Fifth and section 2, Ninth. The first, in 1937, assumed that section 1, Fifth controlled the issue of eligibility in section 2, Ninth cases. *Nashville, C. & St. L. Ry. v. Railway Employees' Dep't.*, 93 F.2d 340 (6th Cir.1937), *cert. denied*, 303 U.S. 649, 58 S.Ct. 746, 82 L.Ed. 1110 (1938). It refused, however, to give section 1, Fifth a "narrow and too literal construction." *Id.* at 342.

In *Nashville*, the Board conducted a section 2, Ninth secret ballot in which it allowed 140 employees not actually working for the carrier on the date of election to vote. The employees, called furloughed employees, were still on the carrier's seniority roster subject to recall. The carrier refused to honor the Board's certification of the union, in part on the grounds that the Board had violated the statute by allowing persons to vote who were not within section 1, Fifth's definition of an employee.

As the court saw it, the issue was whether the furloughees were "in the service of the carrier," so as to be within section 1, Fifth. The court looked in part to the language of the statute as a whole, and in particular to section 6, which details the procedures for changing rates of pay, rules, and working conditions. Because that section speaks of "the parties interested in such intended changes," and because the court found that the furloughees had substantial present as well as future interests in labor negotiations, the court held that the furloughees were in the service of the carrier and therefore were eligible to vote. *Id.* at 343. The fact of a substantial current connection between the furloughees and the carrier at the time of the vote was clearly critical to the court's holding.

Two more recent cases have also rejected arguments that narrow and literal readings of section 1, Fifth govern eligibility in section 2, Ninth cases. *Virgin Atl. Airways, Ltd. v. National Mediation Bd.*, 956 F.2d 1245 (2d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 67, 121 L.Ed.2d 34 (1992); *Professional Cabin Crew Ass'n v. National Mediation Bd.*, 872 F.2d 456 (D.C.Cir.), *cert. denied*, 493 U.S. 974, 110 S.Ct. 497, 107 L.Ed.2d 500 (1989). In both of these case, however, there was still some present connection, either through a pending claim for reinstatement or through a preferential right of rehire, between the eligible voters and the carrier at the time of the originally scheduled vote count.

The contested employees in *Virgin Atlantic* had filed claims for improper discharge on account of their union activity. Part of the relief they sought was reinstatement. Under the NMB's regulation concerning the eligibility of discharged employees,

Dismissed employees whose requests for reinstatement [on] account of wrongful dismissal are pending before proper authorities ... are eligible to participate in elections among the craft or class of employees in which they are employed at time of dismissal.

29 C.F.R. 1206.6. While the employees' reinstatement claims were still pending, the NMB mailed out ballots and set the date for counting the votes.

Because the reinstatement case was close to being resolved, the carrier requested that the NMB sequester the ballots of the challenged employees until after the claims were resolved. The NMB at first granted this request, indicating that the ballots would be impounded until all reinstatement claims were resolved. The day after the originally scheduled vote, however, the NMB reversed its decision and scheduled the vote count for the following day. The NMB also indicated that the votes from all those eligible as of the originally scheduled count date would be counted.

On the morning of the day of the vote count, the District Court held that the employees had not been discharged on account of their union activity and therefore denied their claims for reinstatement. The NMB was informed of this decision before it counted the votes, but stood by its earlier decision that all those eligible as of the original count date would be allowed to participate.

The carrier eventually sued the NMB claiming, among other things, that counting the votes of the challenged employees was a gross violation of the RLA. The district court found jurisdiction and set aside the certification. On appeal, however, the Second Circuit found no gross violation of the RLA and reversed.

The circuit first noted that there are relatively few commands in the RLA capable of being violated. Further, when challenged with the carrier's argument based on section 1, Fifth's definition of employees the court noted that "it is the NMB, not the federal judiciary, that determines voter eligibility" in section 2, Ninth elections. *Virgin Atlantic,* 956 F.2d at 1250.

In response to the carrier's argument that, by counting the votes of the challenged employees, the NMB violated its own regulation, the court then cited an NMB practice when it impounds ballots. According to this practice, when ballots are impounded, the NMB preserves the status quo as it existed on the original count date. Without substantial analysis, the court found that this practice violated neither the NMB's regulation nor the RLA. Further, because the NMB followed this practice, the court found no violation of the Act.

Finally, citing the NMB's duty to insure that the choice of representatives is made without interference, influence, or coercion, the court stated as follows: "The NMB may properly use its power to designate participants in elections to counteract or prevent carrier influence in the choice of a representative by the employees." *Id.* at 1251. As an example of this, the court cited *British Airways Bd. v. National Mediation Bd.,* 685 F.2d 52 (2d Cir.1982).

In *British Airways,* the court upheld the NMB's use of an eligibility cut off date two years prior to the election. Although the *British Airways* opinion makes it clear that employees hired after the cut off date *were not* allowed to vote, it says nothing about whether employees who left the carrier after the cut off date *were* allowed to vote. *Id.* at 53. *British Airways* is therefore of little help in resolving the case at bar.

In the second modern case to address the interrelation of section 1, Fifth and section 2, Ninth, the challenged employees were permanently replaced strikers who were ranked in seniority order on a preferential rehire list. *Professional Cabin Crew Ass'n v. National Mediation Bd.,* 872 F.2d 456 (D.C.Cir.), *cert. denied,* 493 U.S. 974, 110 S.Ct. 497, 107 L.Ed.2d 500 (1989). The Board determined that these employees were eligible on two grounds, first, because it held that employees who are not working because of a labor dispute are still in the employ of the carrier, and second, because at the time of the Board decision, the strikers had pending claims for reinstatement which made them eligible under the Board's *Representation Manual* and Rules.

In court, plaintiff argued that section 1, fifth limited eligible voters to those " 'in a current work or service relationship' with the employer." *Id.* at 460. The court rejected plaintiff's statutory construction argument, stating that:

> Taken to its logical end, PCCA's construction of the statute excludes from the definition of employees not only former strikers, but furloughees, individuals on leaves of absence, and dismissed employees with pending claims for reinstatement as well. PCCA's extreme position has been rebuffed by the Board and courts alike.

*Id.* The court then noted that *Nashville* had rejected a similar argument more than half a century earlier. Further, as in *Nashville*, the challenged employees in *Professional Cabin Crew* retained their seniority rights and were being recalled as work became available.

Finally, the court discussed the Board's precedent and rules, specifically 29 C.F.R. 1206.6 discussed above. Under these, the court held that it was reasonable for the Board to consider replaced strikers as "dismissed employees." Accordingly, given that the strikers had reinstatement claims pending with the proper authorities, the court found no violation of the RLA in the Board's decision that the strikers were eligible voters.

This court must acknowledge the sweeping statements about the Board's discretion in matters of eligibility that have been made by the *Virgin Atlantic* and *Professional Cabin Crew* courts. As noted above, the *Virgin Atlantic* court stated that the Board "may properly use its power to designate participants in elections to counteract or prevent carrier influence." *Virgin Atlantic*, 956 F.2d at 1251. Similarly, the *Professional Cabin Crew* court stated that "in the absence of a gross statutory violation, the resolution of the meaning of 'employee' ... finds its last terminal point with the Board." *Professional Cabin Crew*, 872 F.2d at 462.

The factual situation before this court is, however, substantially different from that before the *Nashville, Virgin Atlantic*, or *Professional Cabin Crew* courts. In all of those cases, the persons deemed eligible had some present or possible future relationship with the employer through either preferential rehire agreements or pending reinstatement actions. In the case at bar it is uncontested that none of the thirteen challenged former employees had any such present or possible future connection to WCRC at any time during the re-run elections.

While the prior cases acknowledge the Board's substantial latitude in interpreting the meaning of the term employee, none of them stand for the proposition that non-employees can vote in section 2, Ninth elections. Such a proposition would fly in the face of the plain language of section 2, Ninth which is devoted to determining the true wishes of the carrier's employees. As substantial as the Board's discretion under section 2, Ninth may be, the court finds that it does not extend so far as the Board would argue in this case, that is, to allowing former employees with no connection whatsoever to the carrier to vote in representation elections.

The Board argues that Mediator Stites found that the circumstances of the separations were tainted by improper interference, influence, or coercion by the carrier. It further argues that its actions are lawful given its authority to use elections or "any other appropriate method ... as shall insure the choice of representatives by the employees without interference, influence, or coercion." 45 U.S.C. § 152, Ninth. But even this authority to use "any other appropriate method" is still limited to a concern for the wishes of employees, not former employees.

The Board also argues that because this is a re-run election, rather than a first time election, it has the power to "re-create the voting conditions that would have existed at the time of the initial election absent the carrier's interference." Ct. Rec. 60 at 13. The court can not contest the Board's duty to attempt to determine how the employees would have voted, had there been no interference, in August, 1990. However, the Board's argument that it should be able to use the original eligibility lists regardless of the separation of the thirteen employees still ignores section 2, Ninth's implicit command

that it is the employees who are to choose their representative, not former employees. While the Board relies on *Virgin Atlantic*'s language about the Board's power to use eligibility determinations to counteract carrier interference, the substantial factual differences between this case and *Virgin Atlantic* make that language unpersuasive authority. Further, as the Ninth Circuit has recently stated, "the Board errs in its assumption that its discretion in choosing the means by which to conduct a representation investigation are completely unfettered." *America West Airlines, Inc. v. National Mediation Bd.*, 986 F.2d 1252, 1257 (9th Cir.1993).

Finally, the Board argues that, "Absent a specific statutory prohibition, a court has no jurisdiction to overturn a discretionary decision by the Board." Ct. Rec. 69 at 9. This proposition has very recently been rejected by the District of Columbia Circuit. In *Railway Labor Executives Ass'n v. National Mediation Bd.*, 988 F.2d 133 (D.C.Cir.1993), the Board argued that judicial review of section 2, Ninth cases was only possible where the Board had transgressed an explicit "shall not" command. *Id.* at 137. As the court noted, "a statutory proscription may be unspoken, yet entirely plain." *Id.* at 138.

At issue in *Railway Labor Executives* was a Board procedure adopted in response to the increase in railroad mergers in the 1980s. Under this procedure, the Board would undertake a section 2, Ninth investigation at the request of a carrier or on the Board's own initiative. This conflicted with prior practice under which only the employees could trigger a section 2, Ninth investigation. After analyzing the plain meaning of section 2, Ninth, the legislative history, and the concerns underlying the Act, the court concluded that "Congress did not empower the NMB to vest in itself or in carriers authority to invoke the NMB's services" under section 2, Ninth. *Id.* at 141.

Section 2, Ninth does not say that the Board shall not undertake an investigation unless its authority is invoked by the employees. Nevertheless, the *Railway Labor Executives* court found that "Section 2, Ninth, as Congress shaped the provision, does not bear the new construction the Board has placed

upon it" and that the Board's new procedure created "a regime and role for the Board notably different from the design and function Congress delineated for the NMB." *Id.* at 134, 138. Accordingly, the court found that the case was an exceptional one justifying judicial review as the Board had "arrogated authority Congress did not give it to revise Section 2, Ninth." *Id.* at 138.

The court finds that the case at bar much more closely resembles *Railway Labor Executives* than it does *Nashville* and its progeny. The RLA clearly speaks to the employees' selection of their representative. It therefore implicitly commands that representation elections, whether original or re-run, should be conducted among current employees or persons with some plausible present or future connection to the carrier. The Board simply makes no convincing argument as to how the statute can tolerate election participation by people who have no tie whatsoever to the carrier. Such people fit nowhere within the definitions of employee found in the statute itself, in prior Board decisions, or in any judicial decisions cited to this court.

Accordingly, the court finds that the thirteen former employees of WCRC were not employees within the meaning of the RLA at any time after the Board's February 5, 1993 Order. The court further finds that allowing these former employees to participate in the February, 1993 re-run elections was an arrogation of authority Congress has not given the NMB to revise Section 2, Ninth. Accordingly, the NMB's decision to allow them to vote was a gross violation of the RLA sufficient to confer jurisdiction on the court and to entitle plaintiffs to summary judgment. The court is therefore granting plaintiff's motion for summary judgment on the issue, denying defendant's motion for summary judgment, and entering an order setting aside the NMB's certifications that were based on the February, 1993 elections.

**CONCLUSIONS:**

For the reasons discussed above, **IT IS HEREBY ORDERED** that:

1) Plaintiff's motion to strike portions of William Gill, Jr.'s third declaration is **DENIED**. Specifically, the motion is denied on the merits as to the following paragraphs: 7–11, 13–

20, 22, and 24–25. It is further denied as moot as to the following paragraphs: 12, 21, and 23.

2) Defendant's motion to dismiss or for summary judgment is **GRANTED IN PART AND DENIED IN PART.** It is denied as to the voter eligibility issues discussed in section iii.e above. As to all other issues, it is granted and the claims of plaintiff and intervenors are therefore **DISMISSED.**

3) Plaintiff's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART.** It is granted only as to the voter eligibility issues discussed in section iii.e above, that is, as to the NMB's gross violation of the RLA in finding former employees eligible to vote, counting their votes in the February, 1993 elections, and certifying the UTU based on those votes. The motion is denied as to all other issues.

4) Given that the eligibility decision was in gross violation of the Railway Labor Act, the February, 1993 elections and the resulting certifications are void. The National Mediation Board shall therefore set aside the certifications issued in the crafts of Trainmen and Engineers at the Washington Central Railroad Company.

**IT IS SO ORDERED.** The Clerk is directed to enter this order and forward copies to counsel. The clerk is further directed to enter judgment accordingly and to close the file.