**PROFESSIONAL CABIN CREW ASSOCIATION, et al.,**
**Appellants,**

v.

**NATIONAL MEDIATION BOARD, an Agency of the United States,**

**Independent Federation of Flight Attendants.**

**No. 88–5200.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 10, 1989.

Decided April 7, 1989.

Ky P. Ewing, Jr., with whom Charles D. Tetrault and Christopher T. Corson, Washington, D.C., were on the brief, for appellants.

Marc Richman, Atty., Dept. of Justice, with whom John R. Bolton, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., John F. Cordes, Atty., Dept. of Justice, Washington, D.C., and Ronald M. Etters, Gen. Counsel, National Mediation Bd., were on the brief, for appellee, the National Mediation Bd.

Patrick J. Szymanski, with whom Roland P. Wilder, Jr., and Christy Concannon, Washington, D.C., were on the brief, for appellee, Independent Ass'n of Flight Attendants.

Before ROBINSON, EDWARDS, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

Professional Cabin Crew Association ("PCCA" or "appellant") appeals from a summary judgment entered by the District Court in favor of defendants National Mediation Board ("NMB" or "Board") and Independent Federation of Flight Attendants ("IFFA"). PCCA argued before the District Court that the NMB exceeded its authority under the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151–88 (1982), when it dismissed PCCA's application for certification as the representative of flight attendants employed by Trans World Airways, Inc. ("TWA"), an interstate common carrier subject to the provisions of the RLA. The District Court held that it lacked jurisdiction to review the NMB's prior dismissal. PCCA appealed to this Court. We affirm.

I. FACTUAL BACKGROUND

The facts are not in dispute. Since 1977, IFFA has been the certified bargaining rep-

resentative of the craft or class of flight attendants employed by TWA. In March, 1986, a majority of the approximately 6,000 flight attendants struck the airline. Nearly 1,000 of the attendants either remained at work or left the picket lines early. Before the striking employees offered to return to work at strike's end, TWA exercised its right to hire permanent replacements. It immediately rehired 196 former strikers and placed the rest in seniority order on a "preferential rehire" list. By the time of the NMB decision, approximately 800 were recalled from the list.

IFFA subsequently filed two federal civil actions challenging TWA's conduct. In the first, it sought immediate reinstatement of all of the former strikers, alleging that TWA had failed in its obligation to bargain in good faith. The action was later dismissed by the district court and an appeal is currently pending. *Independent Fed'n of Flight Attendants v. Trans World Airlines*, 682 F.Supp. 1003 (W.D.Mo.1988), *appeal docketed*, No. 88–1984WM (8th Cir. Jul. 7, 1988). In the second, approximately 1,500 of the strikers alleged that even if the strike was economic, they were entitled to reinstatement under the terms of the collective bargaining agreement or under the RLA itself. The Supreme Court recently rejected their claim for reinstatement in preference to less senior attendants who returned to work before the strike ended. *Trans World Airlines v. Independent Fed'n of Flight Attendants*, — U.S. —, 109 S.Ct. 1225, 103 L.Ed.2d 456 (1989) *rev'g* 819 F.2d 839 (8th Cir.1987). As will be seen below, it is significant that both cases were pending when the Board issued the challenged decision.

Several months after the strike ended, TWA acquired Ozark Air Lines by merger. The representative of Ozark's attendants, the Association of Flight Attendants ("AFA"), thereafter filed a petition with the NMB seeking to ascertain whether it or IFFA was now the representative of the attendants formerly employed by Ozark. Believing that AFA's petition was proce-

durally defective, IFFA filed its own petition seeking to have the same question resolved. On December 15, 1986, the recently formed PCCA requested intervention in the IFFA action, stating as its purpose the ousting of IFFA as the representative of TWA's attendants. After a six-day hearing on the AFA petition, on May 7, 1987, the NMB concluded that AFA's representation of the former Ozark attendants now employed by TWA had been terminated by the merger. 14 Determinations of the National Mediation Board ("N.M.B.") at 256, 257 (1987). IFFA withdrew its petition shortly thereafter, stating as its reason the Board's resolution of the "single carrier" issue. *See* Joint Appendix ("J.A.") at 159. On July 20, 1987, the NMB announced that it would accept IFFA's withdrawal, and that for this reason it would no longer consider PCCA's application for intervention. 14 N.M.B. at 343 (1987). It alerted PCCA of its right to convert its application into a representation application in its own right, which would require "a verified showing of interest 'from at least a majority of the craft or class.'" 14 N.M.B. at 345 (quoting 29 C.F.R. § 1206.2(a)).

On July 30, 1987, PCCA filed its application, which was accompanied by a showing of interest alleged to be a majority of the approximately 5,100 attendants then currently working for TWA. The showing of interest also allegedly represented more than thirty-five percent (but less than half) of the total of currently working attendants and former strikers whose reinstatement claims were then pending. After conducting an investigation (discussed more fully in Part II–D, below), the NMB's Representative concluded that the former strikers were presumptively eligible to vote.[1] PCCA appealed to the full Board from the ruling on the status of the former strikers as a class.

## A. *NMB Decision*

On November 10, 1987, the NMB ruled by a 2–to–1 vote that the former strikers

---

1. Further proceedings led to the removal of sixteen former strikers who were found to be working for other airlines.

should be considered as potentially eligible voters. *Professional Cabin Crew Ass'n*, 15 N.M.B. at 11 (1987). Its decision that the strikers were presumptively eligible rested on two apparently independent bases: (1) it and the Eighth Circuit had previously held that employees who are not working because of a labor dispute remain in the employ of the carrier; and (2) the pendency of reinstatement litigation made the strikers eligible under the NMB's *Representation Manual* and Rules. Because PCCA's representation application lacked a majority showing of interest from the 9,328 formerly and currently working attendants, the Board dismissed its application. *Id.* at 16–17. After the Board denied its request for reconsideration, PCCA filed a complaint with the District Court.

## B. *District Court Decision*

PCCA contended before the District Court that the NMB had exceeded its authority under the RLA by including the approximately 4,000 former strikers as potentially eligible voters, by requiring PCCA to file a representational request, as opposed to treating the union as an intervenor in the IFFA petition (thereby requiring a fifty percent, rather than a thirty-five percent, showing of interest), and by failing to fulfill its statutory duty to investigate the actual eligibility of individual former strikers. IFFA intervened and participated as a defendant.

After noting that " '[j]udicial review of NMB decisions is one of the narrowest known to the law,' " the District Court concluded that PCCA failed to show that the challenged conduct constituted a gross violation of the RLA or a denial of a constitutional right. *Professional Cabin Crew Ass'n v. NMB*, No. 87–3446–LFO, 1988 WL 59667 (D.D.C. May 7, 1988) (quoting *International Ass'n of Machinists v. Trans World Airlines*, 839 F.2d 809, 811 (D.C. 1988)) (J.A. at 668, 672). The Court reached this conclusion by finding that the NMB "did not violate any express provision" of the RLA, J.A. at 672, "fulfilled its statutory duty to investigate," *id.* at 673, and did not err in requiring a fifty percent showing of interest to justify an election.

*Id.* at 675. Having so concluded, the Court held that it lacked jurisdiction to review the NMB's dismissal, and accordingly granted summary judgment in favor of NMB and IFFA. PCCA appealed to this Court.

## II. DISCUSSION

### A. *Jurisdiction*

■ Judicial review of NMB decisions is extraordinarily limited. *See Switchmen's Union of N. Am. v. NMB*, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943); *Brotherhood of Ry. & S.S. Clerks v. Association for the Benefit of Non–Contract Employees*, 380 U.S. 650, 85 S.Ct. 1192, 14 L.Ed.2d 133 (1965) (*Railway Clerks*). Courts have authority to review NMB determinations only upon a " 'showing on the face of the pleadings that the certification decision was a gross violation of the [RLA] or that it violated the constitutional rights of an employer, employee, or Union.' " *International Ass'n of Machinists v. Trans World Airlines*, 839 F.2d 809, 811 (D.C.Cir.) (citation omitted), *cert. denied*, —— U.S. ——, 109 S.Ct. 62, 102 L.Ed.2d 40 (1988). Courts take only a "peek at the merits" to determine if the NMB has committed an error of "constitutional dimension or gross violation of the statute." *International Bhd. of Teamsters v. Brotherhood of Ry., Airline & S.S. Clerks*, 402 F.2d 196, 205 (D.C.Cir.), *cert. denied sub nom. Brotherhood of Ry., Airline & S.S. Clerks v. NMB*, 393 U.S. 848, 89 S.Ct. 135, 21 L.Ed.2d 119 (1968). The court is empowered to proceed no further unless the "peek" reveals an error that is "obvious on the face of the papers ... without extension to 'arguing in terms of policy and broad generalities as to what the Railway Labor Act should provide.' " *Id.* (quoting *Railway Clerks*, 380 U.S. at 671, 85 S.Ct. at 1203). *See also WES Chapter, Flight Eng'rs' Int'l Ass'n v. NMB*, 314 F.2d 234, 236 (D.C.Cir.1962) (stating that courts have taken jurisdiction where "the Board had acted in excess of its delegated powers and contrary to a statutory provision which is 'clear and mandato-

ry' ") (quoting *Leedom v. Kyne,* 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958)).[2]

### B. *Inclusion of Former Strikers as Eligible Voters*

■ PCCA argues that the inclusion of the former strikers as potentially eligible voters violated the "plain language in the RLA," and was inconsistent with decisions of four circuits that "have recognized that Congress allowed no latitude for non-workers" in its definition of employee. As we show below, the NMB's decision to include the former strikers as eligible voters does no violence to the language of the RLA and is supported by both its own precedent and that of the several courts that have touched upon this question.

### 1. *Construction of the statute.*

PCCA relies on two statutory provisions for its proposition that the RLA's "plain language" limits eligible voters to those "in a current work or service relationship" with the employer. The first, Section 1, Fifth states:

> The term "employee" as used herein includes every person in the service of a carrier (subject to its continuing authority to supervise and direct the manner of rendition of his service) who performs any work....

45 U.S.C. § 151, Fifth. The second, Section 201, which amended the RLA to make it applicable to airlines, provides:

> All of the provisions of [Title I of the Act] ... shall cover every common carrier by air ... and every air pilot or other person who performs any work as an employee or subordinate official of such carrier or carriers, subject to its or their continuing authority to supervise and di-

rect the manner of rendition of his service.

45 U.S.C. § 181.

The District Court rejected appellant's interpretation of Section 1, Fifth, concluding instead that it "simply sets forth the indicia relevant to the existence of an employment relationship." J.A. at 673 (citation omitted). PCCA argues that the Court erred in its reliance on the section's use of *includes,* which appellant contends is used as a term of limitation rather than enlargement. It also observes that *includes* does not appear in the definition applicable to airlines, Section 201, quoted above. We note, however, that neither section purports to speak exclusively. Limited as we are in our jurisdiction to reviewing "gross violation[s]" of the RLA, *International Ass'n of Machinists,* 839 F.2d at 811, we are unable to find that the negative implication appellant urges crosses this lofty threshold. Taken to its logical end, PCCA's construction of the statute excludes from the definition of employees not only former strikers, but furloughees, individuals on leaves of absence, and dismissed employees with pending claims for reinstatement as well. PCCA's extreme position has been rebuffed by the Board and courts alike.

More than a half century ago, the Sixth Circuit rejected as "narrow and too literal" the very position that PCCA advances here: namely that "one who presently performs no service, and who ... may never again be employed," is not "in the service of a carrier." *Nashville, C. & St. L. Ry. v. Railway Employees' Dep't of A.F.L.,* 93 F.2d 340, 342 (6th Cir.1937), *cert. denied,* 303 U.S. 649, 58 S.Ct. 746, 82 L.Ed. 1110 (1938). We are unable to square this holding with PCCA's contention that *Nashville*

**2.** NMB argues that review is limited to violations of provisions of the RLA that are expressly negative in nature: "review is available solely to remedy an action by the Board 'in excess of its delegated power and contrary to a *specific prohibition in the Act.*'" Brief for Appellee NMB at 20 n. 8 (quoting *Railway Clerks,* 380 U.S. at 660, 85 S.Ct. at 1197; emphasis in source). PCCA disagrees, contending that all that is required in order for court intervention is conduct by the Board which violates a mandatory command,

whether affirmative or negative. We need not address the question in this case. We note that there is no indication in the District Court opinion that it restricted its review to violations of expressly prohibitive RLA provisions. Rather, the Court explicitly rested its decision on its finding that no "express provision" of the RLA was violated by the NMB. As we explain below, we likewise hold only that the Board did not act clearly contrary to its statutory authority. *Cf. WES Chapter,* 314 F.2d at 237.

demonstrates that a court is plainly bound by the "in service" requirements PCCA asserts. As even appellant admits, the case held that furloughees could be considered as employees if their departure was involuntary, temporary, and combined with a right to return. *Id.* at 342–43. PCCA emphasizes that the furlough procedure in *Nashville* was provided for and controlled by the parties' collective bargaining agreement, and that employer and furloughee retained mutual obligations. Although we do not attach as much significance to this fact as PCCA does, we nevertheless note that in the present case, as in *Nashville,* the former strikers retained their seniority rights, were recalled as work became available, and, upon recall, were obligated to return to forego their right to employment. *See also IFFA v. Trans World Airlines,* 819 F.2d 839, 842 (8th Cir.1987) ("Employees who are not working because of a labor dispute remain 'employees' of the employer unless they obtain other work."), *rev'd on other grounds,* —U.S. ——, 109 S.Ct. 1225, 103 L.Ed.2d 456 (1989); *cf. Brotherhood of Ry. & S.S. Clerks v. Florida E. Coast Ry.,* 384 U.S. 238, 246–47, 86 S.Ct. 1420, 1424–25, 16 L.Ed.2d 501 (1966) (reasoning that a strike "represents only an interruption in the continuity" of the employment relationship).

Both in its briefs and at oral argument, appellant has urged that a negative implication should be drawn from the National Labor Relations Act's explicit inclusion as an employee of "any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute," 29 U.S.C. § 152(3) (1982). It similarly argues that the NLRA's one-year limit on voter eligibility for economic strikers, *id.* § 159(c)(3), should be observed here. The absence of such provisions from the RLA, however, may reasonably be interpreted as indicating a congressional desire for broader voter eligibility under the RLA. Certainly, the negative implication PCCA

urges is an inadequate basis for us to find the kind of gross violation required to trigger judicial interference in NMB decisions.

### 2. *Board precedent and Rule 6.*

The Board has on at least two previous occasions treated replaced strikers as potentially eligible voters. In *Eastern Airlines,* 4 N.M.B. 24 (1964), the Board held that under its "Rule 6," replaced strikers were entitled to vote as "dismissed employees" because they had pending before proper authorities requests for reinstatement on account of wrongful dismissal. *Id.* at 28–29.[3] The rule to which the Board referred, 29 C.F.R. § 1206.6, by its terms requires that the subjects be "[d]ismissed employees" who have pending proceedings to require their reinstatement. There is no dispute that at the time the NMB rendered its decision, the former strikers had pending at least one, and possibly two such actions for reinstatement. *See supra* at 3. PCCA contends that the regulation is inapplicable because the former strikers do not qualify as "dismissed employees." The Board argues that the regulation applies any time an employee has not quit. Although PCCA refers to this characterization of former employees as an "obvious *non sequitur,*" we note that in *WES Chapter* we contrasted employees who "were 'dismissed' within the meaning of Rule 6" with those who "had merely quit." 314 F.2d at 237. Moreover, the Board's position finds support in *Air Canada v. NMB,* 107 L.R.R.M. 2028 (S.D.N.Y.1980), *aff'd,* 659 F.2d 1057 (2d Cir.), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 381 (1981), where the Board's decision to include terminated former strikers as dismissed employees within the meaning of the rule was upheld as consistent with the rule and the RLA. *Id.* at 2032. *See also El Al Israel Airlines,* 12 N.M.B. 238, 239 (1985) (noting that under Rule 6, determination of eligible voters included "striking employees not otherwise ineligible (*e.g.,*

---

**3.** "Rule 6" provides that

[d]ismissed employees whose requests for reinstatement [on] account of wrongful dismissal are pending before proper authorities ...

are eligible to participate in elections among the craft or class of employees in which they are employed at [the] time of dismissal[.]

29 C.F.R. § 1206.6.

by virtue of working for another carrier)"). Again we can find no error in the District Court's conclusion that PCCA's attack falls far short of the required threshold for review of NMB action.

### 3. *Jurisdiction revisited.*

Appellant's reliance on *Nelson v. Piedmont Aviation,* 750 F.2d 1234 (4th Cir. 1984), *cert. denied,* 471 U.S. 1116, 105 S.Ct. 2358, 86 L.Ed.2d 259 (1985), and *Air Line Pilots Association v. United Air Lines,* 802 F.2d 886 (7th Cir.1986), *cert. denied,* 480 U.S. 946, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987), is ill-founded. Although it is true that in both cases it was held that non-working pilots were not "employees" within the meaning of the RLA, in neither case was the court reviewing an NMB decision. PCCA's response—that this does not mean that "Congress wrote a different statute for the courts than it did for the NMB"— quite obviously misses the point: the extremely limited jurisdiction that constrains us is lacking from the *de novo* review in *Nelson* and *ALPA.* Moreover, in both cases the pilots in question had never actually worked for the carrier. Thus, in *ALPA,* the Seventh Circuit opined that in order for a pilot to be an employee within the meaning of the RLA, he must have at some time actually "performed services for the employer under the employer's supervision." 802 F.2d at 913. In short, both *Nelson* and *ALPA* held that the pilots could not vote because they had *never* been employees as defined by the RLA. In this regard, the cases are factually distinguishable from the present case.

Appellant's resort to *WES Chapter* is no more availing. It is certainly true, as PCCA points out, that in *WES Chapter* the NMB barred permanently replaced former strikers from participating in a representation election. From this fact alone, PCCA concludes that in the present case, "the NMB reversed itself completely on virtually identical facts and *included* permanently replaced workers, and still says that it is not violating the RLA." Brief for Appellant at 25 (emphasis in original). PCCA further argues that "Congress's words manifestly prohibit such latitude, and the

courts of appeal have been unanimous in applying those words rigorously." *Id.*

When properly viewed, however, *WES Chapter* is actually more strongly in the NMB's corner. First, appellant's charge of complete reversal is less than accurate. The *WES Chapter* facts are distinct from those in the instant case. There the strikers had engaged in an unlawful walkout, were not on a preferential rehire list, and so far as the opinion discloses, had no pending claims for reinstatement. More importantly, whether consistent or inconsistent with the facts of the present case, the *WES Chapter* decision reaffirmed the breadth of the NMB's discretion and the narrowness of our jurisdiction to review. We affirmed the District Court's dismissal in that case even though the NMB had failed to explain whether the employees were dismissed or had quit, or whether they had reinstatement applications pending or not, noting once again that

> [w]here courts have taken jurisdiction of [NMB's] representation disputes the context has strongly indicated either that the Board by refusing to act had obliterated rights granted to employees by Congress or ... the Board had acted in excess of its delegated powers and contrary to a statutory provision which is "clear and mandatory."

314 F.2d at 236 (citations omitted). In that case, as in the present, judicial intervention was inappropriate because all that was sought was "a different solution to a mixed factual and legal issue which has been solved by the Board in a manner not clearly contrary to its statutory, including its rulemaking, authority." *Id.* at 237.

In short, application of the *Switchmen's* doctrine compels us to conclude that in the absence of a gross statutory violation, the resolution of the meaning of "employee"— like its definition of "craft"—finds its last terminal point with the Board. We are unable to unearth such a violation, and, accordingly, there will be "no dragging out of the controversy into other tribunals of law." *Switchmen's Union,* 320 U.S. at

305, 64 S.Ct. at 99.[4]

## C. *Failure to Treat PCCA as Intervenor*

■ PCCA argues that the Board's decision to refuse to treat it as an intervenor, and thereby require it to demonstrate the fifty-percent showing of support required for a representation application in its own right, was erroneous.

As we noted above, following the TWA–Ozark merger, IFFA petitioned the NMB for recognition as the representative of all TWA attendants. When the NMB concluded that AFA's representation of the former Ozark attendants had been terminated by the merger, IFFA withdrew its petition. In the meantime, however, the upstart PCCA requested intervention in the IFFA action. It contends that its right to intervene was then "perfected," and that the Board was required to accept its thirty-five-percent showing of interest as sufficient. It is not clear from a careful reading of PCCA's briefs what it argues the showing was sufficient for; it interchangeably refers to its right to an investigation and to an election. *Compare* Brief for Appellant at 40 ("If PCCA had obtained its election on [its intervenor] application, all parties would have had a chance....") *with id.* at 41 (Board was under a statutory duty to investigate). We are compelled to conclude that even if properly argued, both claims are wanting.

Careful review of Section 2, Ninth reveals that Congress neither specified who may participate in an election nor on what basis—nor for that matter, under what circumstances an election is appropriate at all. The nearest intimation it gave was its direction that "the Board shall designate who may participate in the election and establish the rules to govern the election." 45 U.S.C. § 152, Ninth. To resolve the question before us, we must resort to the Board's "showing-of-interest" rules. The most logical starting point is 29 C.F.R. § 1206.2(a), which states that "[w]here the

employees involved in a representation dispute are represented ... a showing ... from at least a majority of the craft or class must be made before the [NMB] will authorize an election." 29 C.F.R. § 1206.5 qualifies this rule by allowing an "intervening" organization to produce a thirty-five-percent showing of interest in order "to warrant placing the name of the intervenor on the ballot." A thirty-five-percent showing is sufficient in only one other circumstance: where an applicant seeks certification of an unrepresented class. 29 C.F.R. § 1206.2(b).

PCCA does not directly challenge either the Board's authority to accept IFFA's withdrawal or its application of the various rules; rather, it contends that once the duty to proceed to an election matured, the Board's duty became fixed, so that it operated independently of IFFA's actions. It cites no authority for this proposition, nor are we aware of any. Rather, it appears that in matters relating to elections, Congress vested in the Board "broad discretion ... with only the *caveat* that it 'insure' freedom from carrier interference." *Railway Clerks,* 380 U.S. at 668–69, 85 S.Ct. at 1201–02. The Supreme Court has made clear that the RLA "instruct[s] the Board alone to establish the rules governing elections." *Id.* at 669, 85 S.Ct. at 1202. To accept appellant's invitation to intercede would require that we immerse ourselves deeply into the NMB's intervention and withdrawal procedures. Lacking a demonstration that the Board acted in excess of its statutory authority, we have no power to accede to this request.

■ As we explain more fully in Part II–D, the Board's discretion in its methods and means of investigation is no less broad. *Cf. Railway Clerks,* 380 U.S. at 662, 85 S.Ct. at 1199 (noting that "Congress has simply told the Board to investigate and has left to it the task of selecting the methods and procedures which it should apply in each case"). PCCA relies on Section 2, Ninth, which provides that "it shall be the duty of the Mediation Board, upon

---

4. We have carefully considered appellant's contention that the inclusion of the former strikers violated the current workers' First Amendment and due process rights. We find the argument totally without merit, and need spend no time refuting it. *Cf. International Ass'n of Machinists,* 839 F.2d at 812.

request of either party to the dispute, to investigate such dispute," contending that because it requested an investigation, the NMB was under a duty to so investigate. None of the parties has addressed the fundamental underlying consideration of whether Section 2, Ninth, was triggered in the first instance. To determine this, we must again resort to the Board's rules, this time 29 C.F.R. § 1203.2, which governs "[a]pplications for the services of the [NMB] under section 2, ninth," in the event of a "representation dispute[ ]." *See also American Airlines v. NMB*, 588 F.2d 863, 865–66 (2d Cir.1978) (Section 1203.2 "describ[es] the procedure by which a party seeking certification as the bargaining representative for a 'class or craft' of employees may apply to the Board for an investigation"). To determine whether there was a "dispute" within the meaning of the rule, we must harken to the familiar Section 1206.2, which establishes the "[p]ercentage of valid authorizations required to determine [the] existence of a representation dispute." 29 C.F.R. § 1206.2. *See also Brotherhood of Locomotive Firemen & Enginemen v. NMB*, 410 F.2d 1025, 1033 & n. 8 (D.C.Cir.1969). And, as we demonstrated above, a majority showing is required thereunder unless the party is an intervenor within the meaning of Section 1206.5 or an applicant seeking certification of an unrepresented class under 29 C.F.R. § 1206.2(b). PCCA does not contend that its showing represented a majority of the currently and formerly working attendants. Because we have found that the Board did not err by refusing to treat PCCA as an intervenor, and because the attendants were not at that time unrepresented, it follows that there was no "dispute" within the meaning of Section 1206.2, and, consequently, the Board was under no duty to investigate.

## D. *Investigation of PCCA's Representation Application*

■ The Board began its investigation into PCCA's representation application by requesting that the carrier provide a list of "potential eligible voters." Although TWA first failed to include the former strikers on the list, after the Board's second request it acceded, opining that "we think it likely that a number of individuals on the preferential rehire list will not return if offered rehire[,] which we consider unlikely to occur anytime soon.... We also do not know how many of these individuals are now working for other carriers." J.A. at 208. The Board Representative responded: "TWA has today submitted its preferential rehire list. I am making a preliminary determination that, all other things being equal, these individuals should be included as potential eligible voters." *Id.* at 211. Two weeks later, after reviewing the parties' submissions, the Representative announced that this position was final, and instructed the parties that all challenges and objections to specific individuals on the list "shall be supported by substantive evidence and argument." *Id.* at 335. After reviewing the challenges, sixteen former strikers were eventually excluded from the list. The Board thereafter permitted the parties to re-argue the status of the former attendants as a class, whereupon lengthy briefs and replies were submitted. The Board affirmed the conclusion of its Representative, holding that the former strikers as a class were properly included absent specific reasons for removal.

PCCA contends that the Board's duty to investigate required it to enquire into "the actual eligibility of the potential eligible voters, and *their precise number*," which "was the only issue for the NMB to investigate." Brief for Appellant at 32 (emphasis in original). Because the NMB "presumed current eligibilty for each and every replaced flight attendant," it "resort[ed] to an 'investigation' by presumption," and thereby "failed to fulfill its statutory duty to investigate." It did this although "[t]he *only* evidence that the NMB had was in fact to the *contrary*." *Id.* at 36 (emphasis in original).

We are unable to find any merit in appellant's contentions. Under Section 2, Ninth, the Board is charged with only two specific duties: "to investigate [the] dispute and to certify" to the parties and to the carrier the names of the authorized representatives involved in the dispute. 45 U.S.C. § 152, Ninth. We need go no further in our analysis than to *Railway Clerks*, where the

Supreme Court made clear that the "broad and sweeping" command to investigate requires only "such investigation as the nature of the case requires," and the investigation "is 'not required to take any particular form.' ... Congress has simply told the Board to investigate and has left to it the task of selecting the methods and procedures which it should employ in each case." 380 U.S. at 662, 85 S.Ct. at 1199 (quoting *Inland Empire Dis't Council v. Millis,* 325 U.S. 697, 706, 65 S.Ct. 1316, 1321, 89 L.Ed. 1877 (1945); footnote omitted). *See also Radio Officers' Union v. NMB,* 181 F.2d 801, 802 (D.C.Cir.1950) ("in the matter of investigation the Board's actions are purely discretionary"). We are unable to require more. Our conclusion on the adequacy of the Board's investigation to meet the requirements of Section 2, Ninth is buttressed by an observation in *Railway Clerks.* There the Supreme Court noted, in discussing a dispute over the nature of the relevant "craft or class," that "[t]o require full-dress hearings on craft or class in each representation dispute would fly in the face of Congress' instruction that representatives should be certified within thirty days of invocation of the Board's services. It places beyond reach the speed which the Act's framers thought an objective of the first order." *Id.* 380 U.S. at 667–68, 85 S.Ct. at 1201–02. While in no sense essential to our decision, we note that Section 2, Ninth, which imposes the duty to investigate relevant to the present dispute, also imposes a similar thirty-day limitation. 45 U.S.C. § 152, Ninth. This being the case, we can hardly say that the brevity of the Board's investigation indicates noncompliance with the congressional mandate.

We note in passing that it appears that the Board complied in every respect with its *Representation Manual,* and particularly with Section 11.3 thereof, which provides for "objections or challenges" to the list of eligible voters. It states that

> [t]he Board representative should ... require that objections and challenges be supported by substantive evidence and argument. The Board representative should advise representatives that unsupported allegations will be insufficient to overcome presumptions of eligibility or

ineligibility as reflected by the list of eligible voters.

*Id.*

The Board investigated the dispute. We are unable to find that in so doing it violated the RLA's "broad and sweeping" commands. We are therefore compelled to conclude as we did in *WES Chapter* that "in discharging its duty to investigate in the manner it did in this case we find no official conduct in excess of authority and no refusal to bring the processes of the Board to bear in a reasonable manner on the dispute." 314 F.2d at 237. Accordingly, we are without jurisdiction to intercede.

### III. CONCLUSION

In view of the above considerations, we conclude that the Board's actions reveal neither a complaint of constitutional dimension nor a gross violation of the statute. Accordingly, its decision is not reviewable, and the decision of the District Court is therefore

*Affirmed.*