United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued May 3, 1999 Decided May 28, 1999 

 No. 98-5435

 US Airways, Inc., 
 Appellant

 v.

 National Mediation Board and 
 Communications Workers of America, AFL-CIO, 
 Appellees

 Appeal from the United States District Court 
 for the District of Columbia 
 (97cv01508)

 Robert A. Siegel argued the cause for appellant. With him 
on the briefs was Tom A. Jerman.

 Bruce G. Forrest, Attorney, United States Department of 
Justice, argued the cause for appellee National Mediation 
Board. With him on the brief were Frank W. Hunger, 
Assistant Attorney General at the time the brief was filed, 

William Kanter, Deputy Director, and Ronald M. Etters, 
General Counsel, National Mediation Board. Theodore C. 
Hirt, Attorney, United States Department of Justice, entered 
an appearance.

 James B. Coppess argued the cause for appellee Communi-
cations Workers of America, AFL-CIO. With him on the 
brief were Daniel M. Katz, Larry Engelstein, and Marsha S. 
Berzon.

 Before: Silberman, Williams, and Tatel, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Silberman.

 Silberman, Circuit Judge: The National Mediation Board 
(NMB) found that US Airways had interfered with its em-
ployees' free choice in a union representation election, and 
issued an order setting aside the results of that election 
(which the union had lost) and prescribing a re-run election 
(which the union won). US Airways challenged the Board's 
order in the district court on First Amendment grounds, 
requesting that the results of the re-run election be set aside, 
but was rebuffed. We reverse.

 I.

 The Communications Workers of America (CWA) failed in 
the first election to garner the votes necessary to represent 
the passenger service employees of US Airways. The union 
saw its defeat as the product of a coercive anti-union cam-
paign waged by the carrier's management leading up to, and 
during, the representation election. Pursuant to s 2, Ninth 
of the Railway Labor Act, the union requested that the Board 
"investigate" the "representation dispute" and "utilize any 
... appropriate method of ascertaining the names of [the 
employees'] duly designated and authorized representatives 
in such manner as shall insure the choice of representatives 
by the employees without interference, influence, or coercion 
exercised by the carrier." 45 U.S.C. s 152, Ninth.

 No one disputes the underlying facts found by the Board in 
its investigation. For some time prior to the representation 
election, an institution known as the "employee roundtable" 

was a key feature of management's relationship with the 
several categories of non-represented passenger service em-
ployees. The roundtables, while focusing on operational and 
other issues in their periodic meetings, also provided a forum 
for occasional discussion and alteration of US Airways' em-
ployment policies. The impact has been real. Modifications 
to the carrier's rules governing vacation scheduling, supervi-
sors' disciplinary authority, and overtime were only a few of 
the changes made from 1991-95.

 In early 1996, a new management team announced the 
formation of a company-wide "System Roundtable," an um-
brella entity unifying the existing roundtables that would 
continue, in the words of one executive officer, to provide a 
forum for "issues affecting employees." The System Round- 
table continued the tradition of its constituent bodies, imple-
menting changes to the carrier's policies governing tardiness 
and trading of shifts among employees, and also delegated to 
several "task forces" the responsibility to study other policies. 
The most notable of these task forces was assigned the job of 
proposing changes to the carrier's apparently widely despised 
policy governing paid days off for vacation and sick days.

 Between the Board's authorization of the election in No-
vember 1996 and the ballot count on January 30, 1997, US 
Airways' management highlighted the above described em-
ployment policy changes and the potential for future progress 
on the matters under study by the task forces. In informa-
tional newsletters, telephone hotlines, and meetings, manage-
ment communicated to the employees that the informal man-
agement-employee relationship embodied in the roundtables 
was inconsistent with union representation: "Electing CWA 
would force the company to eliminate face-to-face policy 
making between management and employees at a time when 
we are beginning to make real progress. Labor laws require 
employees to deal exclusively with the union on issues of 
employment policy."

 After reviewing these facts, the Board's order set forth five 
"initial standards" viewed as indicative of a carrier's interfer-
ence with employee freedom of choice in the context of a 

workplace in which roundtables (also called employee commit-
tees) are present.

 1) The establishment of a committee at any time after 
 the carrier becomes aware of a labor organization's orga-
 nizing efforts;
 
 2) A material change, or a carrier representation of such 
 a change during the critical period in the purpose or 
 activities of a pre-existing committee;
 
 3) The use of a pre-existing committee to expand em-
 ployee benefits during the critical period (the continua-
 tion of existing benefits is a prerequisite of a fair elec-
 tion);
 
 4) Carrier campaigns which indicate a pre-existing com-
 mittee is, or should be, a substitute for the collective 
 bargaining representative;
 
 5) Carrier campaigns which indicate that the certification 
 of a labor organization as the representative of the 
 employees will lead to the termination of a pre-existing 
 committee.
 
US Airways, 24 N.M.B. 354, 385-86 (1997). The Board 
determined that the carrier's activities ran afoul of each of 
these five factors: the carrier had established a new roundta-
ble during the critical period; represented to the employees 
that pre-existing committees had been materially changed so 
as better to address employment practices; used the roundta-
bles to accomplish the recent changes in attendance and shift-
trading policies and the creation of the task forces; portrayed 
the roundtables as an alternative to union representation; 
and predicted that the election of the union would result in 
the elimination of the roundtable process. See id. at 388. 
The Board concluded that "[b]ased upon the totality of the 
circumstances in this case, ... the laboratory conditions 
required for a fair election were tainted." Id. at 393.

 The Board ordered a re-run election, making clear that 
"[t]he Carrier is not permitted to influence, interfere [with] or 
coerce employees in any manner ... in the upcoming elec-

tion." Id. at 396.1 The carrier, after failing to persuade the 
Board to stay its order pending a motion for reconsideration, 
filed a complaint in district court, along with an application 
for a temporary restraining order barring enforcement of the 
Board's order. Relying in part on the Board's representation 
at the TRO hearing that "[i]f the election goes forward, and 
then a decision is issued by the court that the board's decision 
is invalid, the election will be null and void," the district court 
denied the application. See US Airways, Inc. v. NMB, Civ. 
Act. No. 97-1508, Mem. Order at 3 (D.D.C. July 3, 1997) ("If 
at some point, the provisions of that Order are held to violate 
either the statute or the Constitution, the election will be set 
aside.").

 US Airways, its request for a TRO denied, complied with 
the Board's order. The carrier understood the order's fourth 
and fifth factors to bar it from advocating the roundtables as 
an alternative to union representation and from predicting 
that election of the union would result in the disbanding of 
the roundtables. So US Airways' management remained 
silent on these matters. The union won the re-run election 
by a slim margin: the ballot count on September 29, 1997, 
revealed that of the 8,772 eligible voters, 4,773--or roughly 
54%--cast ballots in favor of CWA. The NMB soon thereaf-
ter certified CWA as the bargaining representative for the 
carrier's passenger service employees. Still awaiting a deci-
sion by the district court on the merits of its complaint, US 
Airways amended its complaint to take account of the now 
completed re-run election: "Because US Airways' speech was 

__________
 1 The Board's order also required US Airways: 1) to post and 
mail to all employees a notice indicating that the Board had found 
that US Airways had interfered with and coerced the employees' 
choice of a representative; and 2) to provide the union with a list of 
employee home addresses. See US Airways, 24 N.M.B. at 393. 
US Airways unsuccessfully challenged these aspects of the order in 
the district court on the ground that they exceeded the Board's 
statutory powers. See US Airways, Inc. v. NMB, Civ. Act. No. 
97-1508, Mem. Op. at 10-14 (D.D.C. July 21, 1998). As US Airways 
does not renew these contentions before us, we express no view on 
them.

unconstitutionally restrained during the rerun election by 
the Board's Order ..., US Airways seeks an order setting 
aside the election and the certification of CWA." Supplemen-
tal Verified Complaint for Declaratory and Injunctive Relief 
p 7 (filed Mar. 27, 1998) (emphasis added).

 The district court ultimately rejected the carrier's constitu-
tional arguments, granting the Board's motion for summary 
judgment. US Airways, Inc. v. NMB, Civ. Act. No. 97-1508, 
Mem. Op. (D.D.C. July 21, 1998). The court rejected the 
carrier's analogy to cases, including NLRB v. Gissel Packing 
Co., 395 U.S. 575 (1969), recognizing an employer's First 
Amendment right to express its views on unionization prior to 
a representation election. Those cases, the district court 
observed, arose in the context of the National Labor Rela-
tions Act, not the Railway Labor Act, and were inapplicable 
because "[t]he role of employers in representation elections 
governed by the RLA is more limited than the activities 
permitted employers under the NLRA." Mem. Op. at 14. 
Alternatively, the district court assumed that the NLRA 
caselaw does apply to the RLA context, and held that US 
Airways' activities are not protected under that framework.

 II.

 The carrier seeks the invalidation of the results of the re-
run election. Its arguments in support are two-fold: the 
carrier first submits that the Board's order unconstitutionally 
penalized it for the expressive activity in which it engaged 
prior to the first election; alternatively, the carrier claims 
that the order unconstitutionally restricted its expression 
during the re-run election period. We begin, for reasons that 
will become apparent, with the latter contention.

 Normally, district courts lack jurisdiction to review certifi-
cation decisions rendered by the NMB within its scope of 
authority under s 2, Ninth of the RLA. Railway Labor 
Executives' Ass'n v. NMB, 29 F.3d 655, 662 (D.C. Cir.) (en 
banc); id. at 673 (Randolph, J., concurring, joined by Mikva, 
C.J., Wald, J., Edwards, J., and Sentelle, J., together com-
prising a majority of the court), amended 38 F.3d 1224 (D.C. 

Cir. 1994) (en banc).2 But this presumption of non-
reviewability falls away if the complainant makes a " 'showing 
on the face of the pleadings that the certification was a gross 
violation of the [RLA] or that it violated the constitutional 
rights of an employer, employee, or Union.' " Professional 
Cabin Crew Ass'n v. NMB, 872 F.2d 456, 458 (D.C. Cir. 1989) 
(quoting International Ass'n of Machinists v. Trans World 
Airlines, Inc., 839 F.2d 809, 811 (D.C. Cir.), amended 848 
F.2d 232 (D.C. Cir. 1988)) (alteration in original). Once an 
employer (or employee or union) pleads a violation of its 
constitutional rights or a gross violation of its statutory rights 
arising from an NMB order, jurisdiction depends on the 
merits of the argument.

 As US Airways points out, however, our approach to the 
two exceptions to the presumption of non-reviewability differs 
somewhat. In examining a challenge predicated on the ex-

__________
 2 The ordinary presumption of non-reviewability of NMB adjudi-
catory decisions rendered pursuant to 45 U.S.C. s 152, Ninth stems 
from Switchmen's Union of North America v. NMB, 320 U.S. 297 
(1943), where the Supreme Court inferred from Congress' careful 
measures to preserve the neutrality and prestige of the NMB in the 
Board's treatment of the "explosive problem" of labor relations in 
the railway industry that if Congress had desired to implicate the 
federal judiciary, it would have said so. Id. at 303. Though 
decided prior to the enactment of the APA, which provides in 
relevant part that judicial review is precluded only to the extent 
that a statute so provides or the agency action is committed to 
agency discretion by law, 5 U.S.C. s 701(a), Switchmen's has since 
been reaffirmed, see Brotherhood of Ry. Clerks v. Association for 
the Benefit of Non-Contract Employees, 380 U.S. 650, 658-60 
(1965). We have reconciled the Switchmen's presumption with the 
APA by describing the presumption as a situation where judicial 
review is precluded by statute, as judicially interpreted; however, 
because the statute does not by its terms preclude judicial review of 
NMB rulemaking and has never been judicially interpreted to do 
so, the Switchmen's presumption does not apply outside the context 
of NMB adjudications pursuant to 45 U.S.C. s 152, Ninth. See 
Railway Labor Executives' Ass'n, 29 F.3d at 673 (Randolph, J., 
concurring, joined by Mikva, C.J., Wald, J., Edwards, J., and 
Sentelle, J., together comprising a majority of the court).

ception for a gross violation of the RLA, we take only a "peek 
at the merits"; that is, we limit the inquiry to "specific 
statutory language, without extension to 'arguing in terms of 
policy and broad generalities as to what the Railway Labor 
Act should provide.' " International Brotherhood of Team-
sters v. Brotherhood of Ry. Clerks, 402 F.2d 196, 205 (D.C. 
Cir. 1968) (quoting Brotherhood of Ry. Clerks v. Association 
for the Benefit of Non-Contract Employees, 380 U.S. 650, 671 
(1965)). The district court thought it was similarly compelled 
to take only a "peek at the merits" of US Airways' constitu-
tional challenge. That was erroneous. Although both consti-
tutional and statutory challenges to NMB decisions should be 
processed by a reviewing court with dispatch given Congress' 
purpose in the RLA "[t]o avoid any interruption to commerce 
or to the operation of any carrier engaged therein," 45 U.S.C. 
s 151a; see International Brotherhood of Teamsters, 402 
F.2d at 205, the "peek" framework is simply not suited to the 
evaluation of constitutional claims. For constitutional argu-
ments cannot sensibly be restricted to the plain text of the 
clause at issue, which is what the "peek" framework would 
require. To be sure, we have suggested otherwise in dicta. 
See Professional Cabin Crew Ass'n, 872 F.2d at 459 ("Courts 
take only a 'peek at the merits' to determine if the NMB has 
committed an error of 'constitutional dimension or gross 
violation of the statute.' ") (quoting International Brother-
hood of Teamsters, 402 F.2d at 205).3 But our only holding 
confirms that a court must do more than just peek. We 
did not reject the constitutional claim in International 

__________
 3 Two of our sister circuits have quoted this dicta approvingly, 
but neither has used it to evaluate a constitutional challenge to an 
NMB decision. See America West Airlines, Inc. v. NMB, 119 F.3d 
772, 775 (9th Cir. 1997); Brotherhood of Maintenance of Way 
Employees v. Grand Trunk W. R.R. Co., 961 F.2d 1245, 1249 (6th 
Cir. 1992). The Fifth Circuit has stated that jurisdiction to review 
a constitutional challenge to an NMB decision exists only "where a 
complaining party makes a 'substantial showing' of a violation of 
that party's constitutional rights as a result of the Board's action." 
Russell v. NMB, 714 F.2d 1332, 1339 (5th Cir. 1983) (quoting 
United States v. Feaster, 410 F.2d 1354, 1366 (5th Cir. 1969) 
(quoting Boire v. Miami Herald Publ'g Co., 343 F.2d 17, 21 (5th 
Cir. 1965))). This formulation seems rather unhelpful.

Association of Machinists until we had "independently" satis-
fied ourselves, 839 F.2d at 812, that there was no authority 
for the proposition of constitutional law asserted by the 
appellants in that case. As we thus engaged in our own 
research in support of a complainant's constitutional chal-
lenge to an NMB decision, but cf. Carducci v. Regan, 714 
F.2d 171, 177 (D.C. Cir. 1983), a fortiori we evaluated the 
complainant's claim on its "full merits."

 We therefore turn to the carrier's claim that the Board's 
order unconstitutionally restrained the carrier (prospectively) 
from engaging in protected expression leading up to the re-
run election. US Airways submits that the order's fourth and 
fifth factors evince the Board's intent to find carrier interfer-
ence based on speech alone, wholly apart from conduct. Such 
an approach, we are told, is an affront to Gissel's teaching 
that the First Amendment allows an employer to express 
anti-union views (so long as threats of reprisal or promises of 
benefits are not imparted) and to make objective, non-
misleading predictions of the likely effects of union represen-
tation. See Gissel, 395 U.S. at 618; see also, e.g., General 
Elec. Co. v. NLRB, 117 F.3d 627, 630 (D.C. Cir. 1997); Crown 
Cork & Seal Co. v. NLRB, 36 F.3d 1130, 1134 (D.C. Cir. 
1994).

 The district court rejected US Airways' reliance on the 
First Amendment principles announced in these cases: "Gis-
sel Packing, and the other cases cited by Plaintiff are inappo-
site for the simple reason that they were decided under the 
NLRA, not the RLA, which is the statute governing this 
case." Mem. Op. at 14. The district court observed that 
"[t]he role of employers in representation elections governed 
by the RLA is more limited than the activities permitted 
employers under the NLRA," id., and reasoned that "[t]he 
Constitution does not tolerate expression by an employer 
found to be specifically prohibited by an Act of Congress," id. 
at 15 (quoting International Ass'n of Machinists v. Continen-
tal Airlines, Inc., 754 F. Supp. 892, 896 (D.D.C. 1990)).4

 Of course the First Amendment does not ebb and flow with 
the legislative will. Yet the force of the First Amendment 

__________
 4 The district court found further support in Trans World Air-
lines, Inc. v. Independent Fed'n of Flight Attendants, 489 U.S. 426 

has been held to vary with context, if not with the desires of a 
given Congress. For example, in Gissel, the Supreme Court 
noted that the rights of employers to express their anti-union 
views must be balanced with the rights of employees to 
collectively bargain, and explained that "any balancing of 
those rights must take into account the economic dependence 
of the employees on their employers, and the necessary 
tendency of the former, because of that relationship, to pick 
up intended implications of the latter that might be more 
readily dismissed by a more disinterested ear." Gissel, 395 
U.S. at 617. Not only is a "balancing" required, the NLRB 
calibrates the scales. See id. at 620 ("[A] reviewing court 
must recognize the Board's competence in the first instance 
to judge the impact of utterances made in the context of the 
employer-employee relationship.") (citation omitted). In an 
attempt to exploit this reasoning, the NMB points to two 
facets of the RLA that differ from the NLRA, and argues 
that these differences justify less employer protection in 
RLA-governed representation elections than in NLRA-
governed representation elections. But the first asserted 
difference is irrelevant: Section 8(c) of the NLRA, 29 U.S.C. 
s 158(c) ("The expressing of any views ... shall not consti-
tute or be evidence of an unfair labor practice under any of 
the provisions of this subchapter, if such expression contains 
no threat of reprisal or force or promise of benefit."), while 
absent from the RLA, "merely implements the First Amend-
ment," Gissel, 395 U.S. at 617. And the second does not even 
exist: the RLA's language prohibiting employer "influence" 
of employees, 45 U.S.C. s 152, Third, Fourth, Ninth, while 
superficially broader than the NLRA's proscription of "inter-

__________
(1989), where the Supreme Court cautioned that "the NLRA 'cannot 
be imported wholesale into the railway labor arena. Even rough 
analogies must be drawn circumspectly with due regard for the 
many differences between the statutory schemes.' " Id. at 439 
(quoting Brotherhood of R.R. Trainmen v. Jacksonville Terminal 
Co., 394 U.S. 369, 383 (1969)). This is sound advice, but clearly 
does not govern the situation presented here where we are inter-
preting not the RLA, but the First Amendment, which applies to 
both the RLA and the NLRA.

fer[ing] with, restrain[ing] or coerc[ing] employees," 29 
U.S.C. s 158(a)(1), has been interpreted to mean pretty much 
the same thing, see Texas & N.O. R.R. Co. v. Brotherhood of 
Ry. Clerks, 281 U.S. 548, 568 (1930). In short, the Board 
provides us with nothing to support its claim that the key 
characteristic of representation elections identified by the 
Gissel Court as mandating lesser-than-usual First Amend-
ment protection of employers' expression--the economic de-
pendence of employee on employer--should be thought of 
differently when that employer is a carrier governed by the 
RLA.

 Thus, we must apply Gissel to determine whether the 
Board's order unconstitutionally restrained US Airways' 
speech leading up to the re-run election. As noted, the Board 
set forth five factors to provide "general guidance concerning 
carrier actions in connection with employee committees," US 
Airways, 24 N.M.B. at 386, a clear indication of their prospec-
tive effect.
 The Board has determined that the following carrier 
 conduct regarding employee committees [i.e., roundta-
 bles] interferes with employee freedom of choice:
 1) The establishment of a committee at any time after 
 the carrier becomes aware of a labor organization's orga-
 nizing efforts;
 2) A material change, or a carrier representation of such 
 a change during the critical period in the purpose or 
 activities of a pre-existing committee;
 3) The use of a pre-existing committee to expand em-
 ployee benefits during the critical period (the continua-
 tion of existing benefits is a prerequisite of a fair elec-
 tion);
 4) Carrier campaigns which indicate a pre-existing com-
 mittee is, or should be, a substitute for the collective 
 bargaining representative;
 
 5) Carrier campaigns which indicate that the certification 
 of a labor organization as the representative of the 
 employees will lead to the termination of a pre-existing 
 committee.
 Id. at 385-86. These factors were not linked by the word 
"and"; nor did the Board ever suggest that more than one 

must be present to support a finding of carrier interference. 
And the Board made clear in the notice it required US 
Airways to post that "[t]he carrier is not permitted to influ-
ence, interfere [with] or coerce employees in any manner in 
an effort to induce them to participate or refrain from partici-
pating in the upcoming election." Id. at 396 (emphasis add-
ed). US Airways reasonably interpreted all this to mean that 
any of "the following conduct" would suffice, and therefore 
that each of the five proscribed activities had to be avoided 
leading up to the re-run election.

 That the fourth and fifth factors--which by their terms 
regulate pure speech--stand apart from the other three (and 
indeed from each other) simplifies the analysis by obviating 
the need for us to confront the situation where an employer's 
otherwise protected speech becomes unprotected because the 
employer also engages in conduct tending to coerce. See 
NLRB v. Virginia Elec. & Power Co., 314 U.S. 469, 478 
(1941) ("The mere fact that language merges into a course of 
conduct does not put the whole course without the range of 
otherwise applicable administrative power. In determining 
whether the Company actually interfered with, restrained, 
and coerced its employees the Board has a right to look at 
what the Company has said as well as what it has done."); see 
also Schweitzer v. NLRB, 144 F.2d 520, 523 (D.C. Cir. 1944). 
This is why we have chosen to focus on US Airways' conten-
tion that its expression leading up to the re-run election was 
unconstitutionally restrained rather than its alternative claim 
that it was unconstitutionally penalized for the expression in 
which it engaged prior to the initial election. The carrier's 
campaign prior to the initial election was a potpourri of 
speech and conduct, and the Board's order would have to be 
evaluated under the theory of Virginia Electric.5 We need 

__________
 5 If we applied Virginia Electric and determined that US Airways 
could not constitutionally be penalized for the particular mix of 
speech and conduct in which it engaged prior to the initial election 
(perhaps because the campaign involved mostly speech and not so 
much conduct), we would be obliged to direct a remand to the 
Board for a determination whether it would reach the same result 
based on the conduct alone. That would afford US Airways less 
than the full relief that it seeks.

not do so, however, because US Airways does not ask that the 
results of the first election (which the union lost) be reinstat-
ed, only that the results of the re-run election (which the 
union won) be set aside. See Supplemental Verified Com-
plaint for Declaratory and Injunctive Relief p 7 (filed Mar. 27, 
1998). That requested relief would follow from a showing 
that US Airways' speech was unconstitutionally restrained 
leading up to the re-run election.

 The fourth and fifth factors proscribe exactly what Gissel 
protects. Whereas the fourth factor would restrict "[c]arrier 
campaigns which indicate a pre-existing committee is, or 
should be, a substitute for a collective bargaining representa-
tive," US Airways, 24 N.M.B. at 386, Gissel teaches that "an 
employer is free to communicate to his employees any of his 
general views about unionism or any of his specific views 
about a particular union, so long as the communications do 
not contain a 'threat of reprisal or force or promise of 
benefit,' " Gissel, 395 U.S. at 618 (quoting 29 U.S.C. s 158(c)).

 The fifth factor would forbid US Airways from "indicat[ing] 
that the certification of a labor organization as the represen-
tative of the employees will lead to the termination of a pre-
existing committee." US Airways, 24 N.M.B. at 386. But 
Gissel shields just this sort of prediction:

 [An employer] may even make a prediction as to the 
 precise effects he believes unionization will have on his 
 company. In such a case, however, the prediction must 
 be carefully phrased on the basis of objective fact to 
 convey an employer's belief as to demonstrably probable 
 consequences beyond his control.... If there is any 
 implication that an employer may or may not take action 
 solely on his own initiative for reasons unrelated to 
 economic necessities and known only to him, the state-
 ment is no longer a reasonable prediction based on 
 available facts but a threat of retaliation based on mis-
 representation and coercion, and as such without the 
 protection of the First Amendment.
 
Gissel, 395 U.S. at 618. Thus, an employer is free to make 
objective predictions, such as that its employees will lose 
vacation time under the terms of the union's national agree-
ment, General Elec., 117 F.3d at 632, or that unionization will 
create a perception that the company is strike-prone and 
unreliable, leading to the loss of customers, id. at 633-34; 
Crown Cork, 36 F.3d at 1134-35, or that unionization will lead 
to prolonged bargaining between the union and the employer, 
Flamingo Hilton-Laughlin v. NLRB, 148 F.3d 1166, 1174 
(D.C. Cir. 1998), but not subjective predictions (i.e., those 
lacking a connection to objective circumstances), such as a 
bare assertion that temporary layoffs could occur if the union 
is elected, General Elec., 117 F.3d at 635; Allegheny Ludlum 
Corp. v. NLRB, 104 F.3d 1354, 1367 (D.C. Cir. 1997).

 Here, the objective circumstance stems from law rather 
than economics, but it is objective nonetheless. Where the 
NMB has certified a representative for a carrier's employees, 
the RLA imposes on the carrier the duty to "treat with" that 
certified representative and none other in negotiating work-
ing conditions and wages. 45 U.S.C. s 152, First, Ninth; see 
Virginia Ry. Co. v. System Fed'n No. 40, 300 U.S. 515, 548-
49 (1937). The Board and appellee CWA do not dispute this 
basic proposition, but argue that US Airways' statement that 
unionization "would force the company to eliminate face-to-
face policymaking between management and employees" was 
only a half-truth given the way US Airways structured its 
roundtables. The Board found that the roundtables primarily 
discussed operational issues having no relation to employment 
policies and only occasionally turned their attention to the 
latter. Appellees accordingly urge that continuation of the 
roundtables in their capacity as a forum for discourse on 
operational issues would be entirely consistent with the stric-
tures of 45 U.S.C. s 152, Ninth, and hence it was misleading 
for the carrier to represent to its employees that the roundta-
bles would have to be shut down in all respects.

 To be sure, US Airways might have explained more pre-
cisely just what it was about the roundtables that was incon-

sistent with union representation. "But if unions are free to 
use the rhetoric of Mark Antony while employers are limited 
to that of a Federal Reserve Board chairman, ... the em-
ployer's speech is not free in any practical sense." Crown 
Cork, 36 F.3d at 1140 (holding protected an employer's pre-
diction that unionization would increase costs, risking the loss 
of cost-sensitive projects and consequent layoffs, notwith-
standing employer's failure to emphasize that the loss of such 
projects was only a risk and not an absolute certainty). It 
was enough for US Airways to connect its prediction that the 
roundtables would be disbanded to the "labor laws," US 
Airways, 24 N.M.B. at 370, 371, 375, especially given the 
history of the fleet service employees' roundtable, which had 
been disbanded after those employees had unionized, id. at 
359; see Crown Cork, 36 F.3d at 1141 (employer's prediction 
that unionization would cause loss of employee benefits under 
the union's ambiguous master agreement supported by past 
authoritative interpretations of the master agreement in simi-
lar circumstances).

 In concluding that the Board's order unconstitutionally 
restrained US Airways' speech leading up to the re-run 
election, we are mindful of the Supreme Court's admonition in 
Gissel that "an employer, who has control over [the employer-
employee] relationship and therefore knows it best, cannot be 
heard to complain that he is without an adequate guide for his 
behavior." Gissel, 395 U.S. at 620. Here, there was not a 
lack of guidance in any sense. Rather, the order exactly (and 
unconstitutionally) informed US Airways of what sort of 
expression was proscribed.

 III.

 Appellee CWA (intervenor below) raises additional argu-
ments not presented by the Board. The union suggests that 
US Airways was not really restrained by the Board's order; 
it remained silent before the re-run election for tactical 
reasons. If the union lost, US Airways would get its desired 
result with no fear that the Board might again order a new 

election; if the union won, US Airways would invoke its 
unconstitutional restraint argument to get a second bite at 
the apple. The union points out that US Airways never once 
presented its "chill" argument to the Board, and argues that 
this failure to exhaust administrative remedies is fatal. The 
union believes US Airways should have sought a clarifying 
opinion from the NMB as to the order's prospective effect.6

 However, the carrier made its request for a TRO, predicat-
ed in part on its chill theory, after the Board had issued its 
order and before the re-run election was held, so it was hardly 
sitting on its claim. At that juncture, the carrier surely 
wished to engage in expression proscribed by the fourth and 
fifth factors of the Board's order, and was concerned that 
doing so might result in an even more severe sanction--as a 
repeat offender--than a re-run election on the Board's stan-
dard ballot. For as the Board has explained, the more 
egregious an employer's behavior, the more severe the penal-
ty. See US Airways, 24 N.M.B. at 381-83 (citing Laker 
Airways, Ltd., 8 N.M.B. 236 (1981) (re-run election on "yes" 
or "no" ballot where the majority of votes cast would deter-
mine the outcome); Key Airlines, 16 N.M.B. 296 (1989) (re-
run election on ballot where certification would result unless a 
majority of eligible voters voted against the union); Sky 
Valet, 23 N.M.B. 276 (1996) (certification based on a check of 
authorization cards)); see also 45 U.S.C. s 152, Tenth (pro-
viding for NMB referral of a carrier's willful violation of 45 

__________
 6 The union makes the quite valid observation that First Amend-
ment chilling effect claims are apparently always advanced when 
the claimant has an interest in engaging in speech in the future, see, 
e.g., Reno v. ACLU, 521 U.S. 844, 871-72 (1997); Chamber of 
Commerce v. FEC, 69 F.3d 600, 603-04 (D.C. Cir. 1995), whereas 
here US Airways contends only that its speech was chilled in the 
past, identifying its present injury in the results of the re-run 
election. We admit this is a unique situation, but we see no reason 
why an injury flowing from the suppression of one's speech in the 
past (if only by chilling) should not be remediable. In any event, 
US Airways undoubtedly has an interest in engaging in expression 
in future elections (including the second re-run election that will be 
held if the results of the first re-run election are set aside).

U.S.C. s 152, Fourth to the United States attorney for prose-
cution as a misdemeanor). Such possibilities, in conjunction 
with the order's fourth and fifth factors, created a more than 
credible threat that the carrier's speech would be suppressed 
by subsequent application of the order, thereby conferring 
standing on the carrier to make the chill argument. See 
Skaggs v. Carle, 110 F.3d 831, 836-37 (D.C. Cir. 1997) (citing 
Virginia v. American Booksellers Ass'n, 484 U.S. 383, 392-93 
(1988)).

 If US Airways had been unable to invoke its chill argument 
later to reverse a union victory (perhaps on the very ground 
that the union advances that one who lacks an ongoing 
interest in speaking cannot be chilled), it would have been 
irreparably harmed. Responding to this concern at the TRO 
hearing, the Board's counsel represented to the district court 
that "[i]f the election goes forward, and then a decision is 
issued by the court that the board's decision is invalid, the 
election will be null and void. The situation will be rectified 
down the road. They will not be stuck with a union represen-
tative if the board's order is struck down." And the district 
court, discussing the irreparable harm issue in the course of 
denying the requested TRO, specifically noted that "[i]f at 
some point, the provisions of that Order are held to violate 
either the statute or the Constitution, the election will be set 
aside." Mem. Order at 3.

 We assume this is why only the union, and not the Board, is 
advancing the exhaustion argument. The Board's failure to 
join undermines the union's claim, since the only litigant with 
an institutional interest in such an exhaustion requirement 
has not argued for it, see Cutler v. Hayes, 818 F.2d 879, 891 
n.95 (D.C. Cir. 1987) (rejecting an intervenor's claim that 
appellants had failed to exhaust administrative remedies in 
part because the agency did not press the issue); but cf. 
Coalition for the Preservation of Hispanic Broadcasting v. 
FCC, 931 F.2d 73, 76 (D.C. Cir. 1991) (noting that the 
exhaustion doctrine concerns economy not only of agency but 
also of judicial resources and that a court may in its discre-
tion raise the issue sua sponte), and there is no suggestion 
that any failure to meet such a requirement (if one exists) 

strips us of jurisdiction, see Darby v. Cisneros, 509 U.S. 137, 
147 (1993). In any event, it would have been futile for US 
Airways to seek a clarifying opinion. While we treat such a 
credible First Amendment chilling effect claim as satisfying 
Article III's case or controversy requirement, see Skaggs, 110 
F.3d at 836-37, the Board has rejected just such a claim as an 
impermissible request for an "advisory opinion," America 
West Airlines, 17 N.M.B. 226, 233 (1990).

 * * * *

 We accordingly reverse the district court's grant of sum-
mary judgment in favor of the NMB and remand the case to 
the district court with instructions to remand in turn to the 
NMB to set aside the results of the re-run election and for 
further proceedings not inconsistent with this opinion.

 So ordered.